ELTON PARSONS, APPELLANT, v. THE STATE OF NEVADA, RESPONDENT.

No. 4031

September 29, 1958.                    329 P.2d 1070.

*Peter Echeverria,* of Reno, for Appellant.

*Harvey Dickerson,* Attorney General, of Carson City; and *William J. Crowell,* District Attorney, Esmeralda County, for Respondent.

## OPINION

By the Court, EATHER, J.:

Parsons was charged with murder. He was convicted of involuntary manslaughter and sentenced to one to five

years. On his appeal from the judgment, he assigns as error (1) that the jury was improperly allowed to separate on numerous occasions; (2) that one of the persons charged as custodians of the jury had not been sworn; and (3) that it was error to instruct the jury relative to manslaughter.

Parsons was a deputy sheriff of Esmeralda County. He lived at Coaldale, 66 miles from Goldfield, county seat of Esmeralda County, and owned a bar at Silver Peak some 24 miles from Coaldale. On the evening of December 12, 1955 two separate reports were made to Parsons at Silver Peak of "an awful fight in Coaldale involving knives and bottles." Parsons drove to Coaldale and asked a man by the name of Whipperman to accompany him, and they drove down the road to the location of where the altercation was fixed. Here something of a fight took place concerning which both Parsons and Whipperman told of an attack by the deceased on Parsons, a retreat and warning by Parsons and finally a shot by Parsons in self-defense which killed the deceased.

(1) Appellant cites six different occasions when the jury was allowed to separate: First, on the first day of the trial by being placed in three cars for the trip to the Santa Fe Restaurant in Goldfield for supper; second, on the return from the Santa Fe to the courthouse; third, when they were divided into three groups in three separate cars to make the 26-mile trip from Goldfield to Tonopah to stay at the Mizpah Hotel overnight, there being no satisfactory sleeping accommodations in Goldfield; fourth, at the Mizpah Hotel, where separate groups occupied separate rooms; fifth, when they ate breakfast at four separate tables at the Tonopah Club in Tonopah the morning of March 30, 1956; sixth, when they were divided into three separate cars for the return trip from Tonopah to Goldfield.

On the evening of March 29, the case having been committed to the jury, juror Ivan McNett asked permission to have the car in which he was riding drive by his mother's house so that he could tell her he was detained on the jury and would not be home. This was done, and

we have below detailed the circumstances surrounding the occasion.

The rule in this state is that if the jury is allowed to separate under conditions indicating the possibility of improper communication, the burden is upon the state to show that such separation was not prejudicial. State v. Parsons, 7 Nev. 57. See also State v. Harris, 12 Nev. 414. At the hearing of the motion for new trial which was based upon the separation of the jury, there were introduced in evidence affidavits of three of the jurors and the oral testimony of the other nine. The testimony of the sheriff and the other two bailiffs in charge of the jury during the asserted separations was also heard. At the conclusion of the evidence on the motion for new trial and after argument of counsel, the court made an order denying the motion. No findings were made upon the issue raised but implicit in the court's denial of the motion is its determination that the separations were not prejudicial.

An examination of the record of the affidavits and testimony referred to clearly supports such implied finding. On each occasion, when the members of the jury were taken to the restaurant for meals, they travelled in three cars, one car closely following the other. There was a deputy in each car. On disembarking, the jurors went directly into the restaurant and were seated at adjoining tables—a deputy being at each table. The return to the courthouse was made in similar manner. The same applies to the trip from Goldfield to Tonopah, the return trip from Tonopah to Goldfield and the breakfast had at Tonopah. On one occasion one of the jurors at one of the meals saw two friends whom he greeted with "Hi." On the occasion of leaving Goldfield for Tonopah to spend the night at the latter place the two McNett brothers on the jury spoke to the sheriff in the hallway of the courthouse, advised that their mother was in a wheel chair, that a woman stayed with her in the day-

time and usually one of the boys stayed at night, so they would have to see her and tell her that they were detained on the jury. The McNett car accordingly stopped at the home of McNett's mother on the way and McNett gave her the information. The information was given on the porch of Mrs. McNett's house, in the presence and hearing of the sheriff, with the remaining jurors in the car but a few feet away. The sheriff testified positively that nothing concerning the case was said. A similar visit on the way back from Tonopah to Goldfield was of like nature. The testimony of the five women jurors and the seven men jurors is to the effect that on not one of the instances of the separations of which complaint is made did any condition exist indicating the possibility of improper communication, and on none of these occasions was the case discussed. Giving full effect to the ruling of this court in State v. Parsons, supra, the court later held in State v. Harris, supra, at p. 422, that where the state accepts and meets the burden of proof to the effect that there was no tampering with or misconduct on the part of a juror, the separation in question was not sufficient ground for a new trial, citing State v. Jones, 7 Nev. 408, Carnaghan v. Ward, 8 Nev. 30, and People v. Boggs, 20 Cal. 432.

We need not, under the circumstances, consider whether there was in legal effect a separation of the jury under the contemplation of our statute.

"In this case the state did show to the satisfaction of the district judge, and to our complete satisfaction, that there was no tampering with, or misconduct on the part of the juror, the separation that occurred was therefore not a sufficient ground for granting a new trial." Such was the language of this court in State v. Harris, supra, p. 422, and such is our conclusion in the instant case.

(2) Sheriff E. N. Kitchen and deputy Frances Carlson had, at the time of the first adjournment, when the jury was taken to lunch, been administered the official oath to take proper charge of the jury. Deputy Archie M. Cordova, a duly appointed and sworn deputy sheriff, had not been administered the official oath for his care of

the jury during the adjournment for meals, or until the night of March 29, 1956, when the case was committed to the jury. This situation is assigned as prejudicial error. No objection to his participation in taking charge of the jury without a new oath was made at any stage of the trial. Defendant and his attorney were present on all occasions. The jury were duly cautioned by the court not to separate, nor to allow any person to talk to them about the case. As heretofore noted, the state proved, at the hearing of the motion for new trial, that there was nothing tending to show that the jury were exposed to any influence that might interfere with the impartial performance of their duties or in any way prejudice the defendant. Under the circumstances appearing from the record, the trial court was not obliged, as a matter of law, to set aside the verdict and grant a new trial because the special oath had not been administered to Cordova prior to the final submission of the case to the jury. United States v. Ball, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300, 304. See also Alterberry v. State, 56 Ark. 515, 20 S.W. 411.

(3) The third error assigned is in the giving of a manslaughter instruction to the jury. As noted, Parsons was charged with murder and convicted of involuntary manslaughter. The defendant contended at the trial and contends here that the entire defense relied upon by the defendant was that of self-defense and that if he was not subject to conviction of murder he was entitled to an acquittal. The information charged defendant with the crime of "murder." NRS 175.455 provides: "In all cases the defendant may be found guilty of any offense the commission of which is necessarily included in that with which he is charged. * * *" NRS 175.460 provides: "1. Upon the trial of an indictment or information, the defendant may be convicted of the crime charged therein, or of a lesser degree of the same crime. * * * 2. Whenever the jury shall find a verdict of guilty against a person so charged, they shall in their verdict specify the degree or attempt of which the accused is guilty." The statutory definition of involuntary manslaughter

provides, in part, as follows: NRS 200.070. "Involuntary manslaughter shall consist in the killing of a human being, without any intent so to do, in the commission of an unlawful act, or a lawful act which probably might produce such a consequence in an unlawful manner; * * *."

We have noted the testimony of appellant, corroborated by Whipperman, indicating that appellant's shot was fired in self-defense. Other testimony, however, is quite to the contrary. The deceased Jimmy Leon Dennis, 15, Shirden Woody, 19, and Don Arbirt Hass, 21, after a rather rough drinking and fighting party had driven down the road a short distance, spread a mattress and lain down to sleep with a canvas over them. Hass testified: "Well, we was there sleeping. I don't know how long we had been asleep, but when I woke up, the first thing I remember somebody was jerking me by the hair of the head. And just as I started to raise up [appellant] hit me with something on my head. * * * He hit me above the eye with a hard instrument. * * * He did not tell me he was an officer or that I was under arrest. * * * Well, after he struck me, the next thing I remember, I was setting up and blood was running down the side of my face, and I wiped the blood off and about the time I wiped the blood off, well, Jimmy Dennis started to raise up and he said: 'What's going on here?' and he started to rise to his feet, and he got one foot on the ground and the other foot was still on the mattress when I heard the gun fire. * * *"

Woody testified that as they were sleepy they pulled off the road and went to sleep. "The next thing I remember after that, Parsons come down and was shaking me by the hair of the head, and he said, 'Get up, you damned butcher-knife artist', and I started to raise up, and he started hitting me on the side of the head. I guess he woke up Don. Then I kind of begin to come out of it, and Jimmy [the deceased] started to get up, and I began to move down towards the foot of the bed. And when Jimmy started to get up, Parsons shot him then. * * *"

It was within the province of the jury to believe and to conclude that appellant was engaged in the lawful act

of apprehending the three men who had been engaged in such fighting and other disturbances to such an extent that they had been reported by two independent sources and to such an extent that one Claude Wiltrout and his wife feared to go to their home unless the three men were apprehended. However, it was also within the province of the jury to believe the testimony of Hass and Woody, in connection with other evidence adduced, to the effect that the shooting of Dennis by Parsons was without any threat or attack by Dennis against Parsons and that the attempted apprehension of Dennis by shooting him was without any cause or justification and was in such sense an unlawful manner of apprehending or arresting him. Under the circumstances we feel that the giving of proper involuntary manslaughter instructions was, under the statutes quoted, amply justified.

Affirmed.

BADT, C. J., and MERRILL, J., concur.