THOMAS RUSSELL LORD, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 20660

February 7, 1991

806 P.2d 548

*Lee Elizabeth McMahon,* Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Rex Bell,* District Attorney and *William P. Henry,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

By the Court, ROSE, J.:

A jury convicted appellant Thomas Russell Lord (Lord) of three crimes: first degree murder, robbery with a deadly weapon and conspiracy to commit robbery and/or murder. The jury sentenced Lord to death. For reasons set forth below, we affirm the convictions and prison sentences therefor, but set aside the sentence of death and remand for a new penalty hearing.

### FACTS

Lord and co-defendant Donald James McDougal (McDougal) were charged with the three crimes stated above. McDougal was tried first, found guilty of all three crimes, and sentenced to life with the possibility of parole for the murder. Appellant Lord was tried separately later, found guilty of the same crimes, and sentenced to death on the murder count, as well as to prison terms on the second two counts.

At Lord's trial, the State proved the following circumstantial case. On October 5, 1988, a 51-year-old man was discovered dead in the bushes just off Interstate 15 in Nevada near the California border. He died of multiple stab wounds. Less than two hours later, Lord, 32, and McDougal, 22, were identified about 76 miles away in California, driving the victim's pickup truck on the same highway. Danny Young, manager of a service station on Interstate 15 in California, testified that he chased Lord and McDougal after they stole some gas from his station. When he caught them, McDougal offered to exchange a gold ring for the gas, which Young refused. Young further stated that he impounded their truck to pay for the gas, and Lord and McDougal walked away into the desert. The two were arrested the next day.

Other testimony indicated that the victim's truck had numerous blood stains in it, that Lord had blood matching the victim's blood-type on one of his boots, and that the blood did not match the blood-type of either Lord or McDougal. Las Vegas Metropolitan Police Detective David Hatch (Hatch) testified that some boot-prints at the scene where the body was dumped appeared

"similar" to the boots Lord was wearing. According to the State's theory of the case, Lord and McDougal stole not only the truck, but also the victim's gold ring and some money. The ring, the money and the murder weapon were never found. However, the victim's mother was allowed to testify that her son wore a gold ring and that she had just recently wired her son $25. Additionally, the victim's pockets were turned inside out and the victim had a patch of lighter skin around one finger, which, according to a physician, indicated that he had recently been wearing a ring.

The defense rested without offering any evidence other than a few photos of the scene where the victim was found. Based on the above evidence, the jury found Lord guilty of the three crimes with which he was charged.

On the day of the penalty hearing, the district judge denied a defense request for a half-day continuance to allow out-of-state witnesses, including Lord's father, to arrive to testify the next morning. As a result, Lord had only one out of seven planned witnesses to testify on his behalf at the penalty hearing. As part of the State's penalty case, Detective Hatch read to the jury a confession which non-testifying co-defendant McDougal had given to police. Following the hearing, the jury returned a penalty verdict of death on the count of murder.

Lord now appeals the convictions and sentence of death. Imposition of the death penalty was stayed pending appeal pursuant to NRS 177.095.

## LEGAL DISCUSSION OF GUILT PHASE

Lord makes eight assignments of error as to the guilt phase, none of which, we conclude, warrants reversal of the convictions.

### 1. *Prosecutor's misstatement of evidence.*

During opening arguments, the prosecutor, William Henry, stated he would prove that McDougal had offered to exchange the *"victim's"* ring for gas, and that boot-prints near the body bore the *"same"* pattern as the boots Lord was wearing. Lord contends that these two statements were error under Garner v. State, 78 Nev. 366, 374 P.2d 525 (1962) (holding that, during opening argument, prosecutor must refrain from stating facts which cannot be proved). Here, the testimony at trial did not directly establish that it was the victim's ring that McDougal had proffered. Further, Detective Hatch could not say that the boot-prints

were the "same" (just "similar"), and he admitted that the boot-prints, in sandy soil, were not very reliable. Thus, we agree that Mr. Henry's comments somewhat overstated the evidence, and that this should be avoided. However, we need not decide if this was error under *Garner.* Defense counsel utilized his very ample cross-examination and closing argument to show that the State had not conclusively proved either of these two facts. Further, the jury was instructed that argument by counsel is not evidence. Under these circumstances, we conclude that any error on this point was harmless under NRS 178.598.

## 2. *Testimony of the victim's mother.*

Lord argues that it was error for the court to allow the victim's mother to testify, essentially because her appearance and testimony were more prejudicial than probative. It is error to allow the relative of a victim to testify where the testimony is not needed to prove or to strengthen proof of a material fact, giving rise to the inference that the relative's appearance was contrived primarily to arouse the sympathy of the jurors; such an unnecessary appearance during the guilt phase may prejudice the penalty phase as well. People v. Brown, 756 P.2d 204, 213 (Cal. 1988). In *Brown,* the testimony of the relative was on purely collateral matters and, hence, was error. Here, however, the State correctly contends that the victim's mother's testimony was very pertinent to the circumstantial proof of robbery. Since the ring and the money were never found, the State needed this testimony to prove that these items were stolen. Therefore, we cannot conclude that the appearance of this witness was contrived primarily to arouse the sympathy of the jurors.

## 3. *Expert testimony of detective.*

Detective Hatch was allowed to testify that, in his opinion, based on his law enforcement experience, certain minor injuries on Lord indicated that Lord had recently been in a fight. Lord contends that it was error to permit this testimony on a medical issue because Detective Hatch was not qualified as a medical expert. Without deprecating Detective Hatch's law enforcement experience, we are persuaded by Lord's contention. When, as here, the cause of injuries is not immediately apparent, the opinion as to the cause should be given by one qualified as a medical expert, not by a law enforcement officer, pursuant to NRS 50.275. Here, for example, the physician might have testified on this point. In other cases where it is apparent that the

victim has been in a fight, no opinion is needed. A photograph of the injuries and counsel's argument will suffice to inform the jury. In any event, layperson opinion pursuant to NRS 50.265 is not an appropriate vehicle to illuminate the cause of these types of injuries. Despite the above, however, we cannot conclude that this error prejudiced Lord's substantial rights. There was other strong evidence of guilt. Additionally, on cross-examination by defense counsel, Detective Hatch admitted that he was uncertain how fresh the wounds were and that the wounds could have been caused by simple accident, rather than a fight.

### 4. *Claimed Doyle violation.*

Lord points out that, on re-direct examination of Detective Hatch, Mr. Henry three times asked Detective Hatch whether Lord had identified himself when Hatch met Lord on the day of the arrest. Lord contends that these questions constituted an improper attempt to draw attention to Lord's post-arrest silence, in violation of Doyle v. Ohio, 426 U.S. 610 (1976). Here, however, unlike the cases in which we have found reversible error upon a *Doyle* violation, the questions went only to Lord's failure to identify himself, not his failure to give an exculpatory story. More important, the prosecutor never once attempted to argue or in any way refer back to this brief testimony. In all, while a defendant's failure to identify himself could be used improperly to call attention to post-arrest silence, this was not done in the present case and, hence, this questioning did not rise to the level of a *Doyle* violation.

### 5. *Disallowed impeachment of witness.*

The fifth error assigned by Lord relates to the testimony given by Mr. Young, the service station manager who chased Lord and McDougal after they stole gas from the station. During cross-examination, Mr. Young admitted that he "observed" the inside *and* outside of the victim's truck when he impounded it. Later, on re-cross examination, defense counsel attempted to ascertain why Young had not noticed the blood stains in the truck until the morning after he impounded it. Young explained that he did not notice the blood because it was night, the truck was parked in an unlit area, and blood looks like dirt at night. Young said he looked inside the truck, but refused to answer yes to defense counsel's query as to whether he "inspected" the interior that evening. After this, defense counsel sought to impeach Young

with a prior statement Young had made in McDougal's trial that he "examined" the interior of the truck that evening. Concluding that this was impeachment on a collateral issue, the district court refused to allow the impeachment. Lord argues that it was error for the court to disallow this impeachment. If Mr. Young had denied even looking into the truck that evening, Lord certainly should have been permitted to impeach Young with the prior inconsistent statement. *See* NRS 50.135. Here, however, we need not reach the issue of whether the district court erred in determining this to be impeachment on a collateral matter, because any error was manifestly harmless. Since Young had admitted to "observing" the interior of the truck, defense counsel already had ample basis for arguing that Young should have noticed any blood stains the night before. The difference between Mr. Young admitting that he "examined" versus "observed" the interior of the truck is marginal at best, especially in light of Young's credible explanation for why he did not notice the blood and in light of the other evidence of guilt.

### 6. *Improper statements quantifying reasonable doubt.*

Lord contends that Mr. Henry improperly quantified the concept of reasonable doubt during closing argument by suggesting that having 90-95 percent of the pieces of a puzzle suffices to convict beyond a reasonable doubt. Whether made by the district judge or the prosecutor, this comment is improper under McCullough v. State, 99 Nev. 72, 657 P.2d 1157 (1983) (error for district judge to say that reasonable doubt meant about 75 percent certainty). Parties to a criminal case should assiduously avoid such attempts to quantify the concept of reasonable doubt. Nevertheless, citing Petrocelli v. State, 101 Nev. 46, 692 P.2d 503 (1985), the State contends that any error was not prejudicial, and we agree. In *McCullough,* this court found the improper comment reversible in large part because the jury also received an improper written instruction on reasonable doubt. In *Petrocelli,* in contrast, this court concluded that the judge's similar comment was not prejudicial because the jury had received the proper written definition of reasonable doubt mandated by NRS 175.211 and because the judge elsewhere explained reasonable doubt in a proper fashion. Here, as in *Petrocelli,* the jury received the proper written instruction. Additionally, immediately after making the improper statements, Mr. Henry proceeded to state the correct statutory definition to the jury. For these reasons, we cannot conclude that this error was prejudicial.

### 7. *Refused instruction on possession of stolen property.*

Lord's seventh assignment of error regarding the guilt phase concerns a jury instruction refused by the district court. The district court refused to grant the defense request for an instruction on possession of stolen property, namely the victim's truck. Lord argues that the refusal constituted error under this court's holding in Moore v. State, 105 Nev. 378, 776 P.2d 1235 (1989).

In capital cases, instructions on lesser included offenses are constitutionally required if requested by the defense. Beck v. Alabama, 447 U.S. 625, 638 (1979). In *Moore,* adopting People v. Geiger, 674 P.2d 1303 (Cal. 1984), this court went one step further by holding that, in some circumstances, a court must grant instructions even for "lesser related offenses," *i.e.,* offenses which are related to the principal offense but are *not* lesser included offenses of the principal offense. Specifically, this court stated:

> [A] defendant has no general right to have the jury presented with a shopping list of alternatives to the crimes charged by the prosecution. However, we hold that the jury should receive instruction on a lesser-related offense when three conditions are satisfied: (1) the lesser offense is closely related to the offense charged; (2) defendant's theory of defense is consistent with a conviction for the [lesser] related offense; and (3) evidence of the lesser offense exists.

*Moore,* 105 Nev. at 383, 776 P.2d at 1238-39 (citation omitted).

Lord has satisfied the first two requirements under *Moore.* First, the lesser related offense of possession of stolen property is closely related to the principal charge of robbery with a deadly weapon. The strongest evidence of robbery was the taking of the truck and the truck is also the property involved in possession of stolen property. *See also* People v. Kamin, 275 N.W.2d 777 (1979) (defendant was charged with robbery; court held that instruction on lesser offense of larceny from the person was required). Second, Lord's theory of defense was consistent with a conviction for possession of stolen property. In closing argument, defense counsel argued that Lord could have received the truck from another person who stole it after committing the actual murder. Defense counsel also argued that, after committing the murder, McDougal could have picked up Lord hitchhiking.

The third and closest question is whether there was sufficient

evidence of the crime of possession of stolen property to warrant this instruction. Before a lesser, non-included offense instruction may be given to the jury, there must be "some evidence in the record to rationally support a conviction on the lesser offense." People v. Early, 692 P.2d 1116, 1120 (Colo.App. 1984) (citation omitted). Defense counsel did not specify to the court exactly which statute he was referring to in support of this instruction. The State contends that the intended statute was NRS 205.2715, which proscribes the "unlawful taking of a motor vehicle." If this was the intended statute, the evidence does not support an instruction on this offense. This statute concerns a more minor crime of joyriding, *i.e.*, the unconsented use of another's car "*without* the intent to permanently deprive." NRS 205.2715. Here, there is no evidence at all that Lord intended to return this vehicle. The evidence shows an attempt to drive away from Nevada; Lord abandoned the vehicle only because Mr. Young forced him to.

Instead of NRS 205.2715, it seems clear that the statute defense counsel was referring to was NRS 205.275, which proscribes "receiving, possessing or withholding stolen goods." As Lord points out, there is some evidence to support a conviction on this crime: (1) Lord was seen driving a stolen truck; and (2) it was McDougal who had the ring, indicating possibly that Lord received control of the truck from McDougal only after McDougal or someone else robbed the victim. On the other hand, NRS 205.275 requires proof that the person received stolen property, that the person knew or reasonably should have known that the property was stolen, and that the person was acting for his own gain. In requesting this instruction, the defense theory was that Lord had nothing to do with the robbery, the murder, or the initial theft of the truck. The theory was that he received the truck sometime after the murder, robbery and initial theft. Yet Lord called no witnesses in his defense in this case. Assuming that Lord had nothing to do with the murder, there is no direct evidence at all in the record that he had received the truck from someone else, that he knew or should have known it was stolen, or that he had received the truck for his own personal gain. The blood stains in the front cab of the truck were not at all obvious. Thus, an innocent passenger taking turns driving would not necessarily know it was a stolen vehicle. Although this is a close question, we conclude that the district court did not err in refusing this instruction. *See Kamin,* 275 N.W.2d 777, (it was not error for the court to refuse to give burglary defendant an instruction on receiving stolen property, because there was no evidence in the record as to the value of the property, an essential element

of the crime); *cf. Moore,* 105 Nev. 378, 776 P.2d 1235, (James Mayfield was charged with murder and requested an instruction to cover the possibility that he was merely an accessory after the fact; there was considerable evidence indicating that Mayfield was not present until sometime after the initial attack and that the victim could well have been dead before Mayfield arrived to help dispose of the body; in short, there was far more evidence than in the present case to support the instruction).

8. *Validity of reasonable doubt instruction.*

Lord's final assignment of error is that the instruction given on reasonable doubt, which followed the definition set forth in NRS 175.211, was improper because a similar instruction was held unconstitutional by the United States Supreme Court in Cage v. Louisiana, 111 S.Ct. 328 (1990). We do not find the instruction given in *Cage* to be similar to Nevada's standard definition contained in the instruction and therefore the *Cage* opinion is not controlling in this case.

Preliminarily, we note that no objection was made to the instruction given on reasonable doubt. Normally, a proper objection is a prerequisite to our considering the issue on appeal. Riddle v. State, 96 Nev. 589, 613 P.2d 1031 (1980). However, since this issue is of constitutional proportions, we elect to address it now.

Lord contends that the reasonable doubt jury instruction given in this case violates the due process clauses of the fourteenth amendment of the United States Constitution and article I, section 8 of the Nevada Constitution. The jury instruction stated:

> The defendant is presumed innocent until the contrary is proved. This presumption places upon the State the burden of proving beyond a reasonable doubt every material element of the crime charged and that the defendant is the person who committed the offense.
>
> A reasonable doubt is one based on reason. It is not mere possible doubt but is such a doubt as would govern or control a person in the more weighty affairs of life. If the minds of the jurors, after the entire comparison and consideration of all the evidence, are in such a condition that they can say they feel an abiding conviction of the truth of the charge, there is not a reasonable doubt. Doubt to be reasonable must be actual and substantial, not merely possibility or speculation.
>
> If you have a reasonable doubt as to the guilt of the defendant, he is entitled to a verdict of not guilty.

This jury instruction was based on NRS 175.211.[1] We have held that a reasonable doubt instruction based on our statutory definition does not violate due process. *See* Cutler v. State, 93 Nev. 329, 566 P.2d 809 (1977). We must examine this conclusion in light of the recent Supreme Court decision.

In *Cage,* the Court stated that "[i]n state criminal trials, the Due Process Clause of the Fourteenth Amendment 'protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' In re Winship, 497 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970)." *Cage* at 329. The Court then went on to hold that the Louisiana trial court's reasonable doubt instruction was constitutionally defective because a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause. *Id.* The instruction provided in relevant part:

> "If you entertain a reasonable doubt as to any fact or element necessary to constitute the defendant's guilt, it is your duty to give him the benefit of that doubt and return a verdict of not guilty. Even where the evidence demonstrates a probability of guilt, if it does not establish such guilt beyond a reasonable doubt, you must acquit the accused. This doubt, however, must be a reasonable one; that is one that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture. *It must be such doubt as would give rise to a grave uncertainty,* raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. *It is an actual substantial doubt.* It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but a *moral certainty.*" State v. Cage, 554 So.2d 39, 41 (La. 1989) (emphasis added).

*Ibid.*

In construing the instruction, the *Cage* decision considered how reasonable jurors might have understood the charge as a

---

[1]NRS 175.211 states:

1. A reasonable doubt is one based on reason. It is not mere possible doubt, but is such a doubt as would govern or control a person in the more weighty affairs of life. If the minds of the jurors, after the entire comparison and consideration of all the evidence, are in such a condition that they can say they feel an abiding conviction of the truth of the charge, there is not a reasonable doubt. Doubt to be reasonable must be actual and substantial, not mere possibility or speculation.

2. No other definition of reasonable doubt shall be given by the court to juries in criminal actions in this state.

whole. The Court stated that the words "substantial" and "grave," coupled with "moral certainty" rather than evidentiary uncertainty could cause a reasonable juror to make a finding of guilt based on a degree of proof below that required. *Id.* at 329-330. After reviewing the instruction as a whole, the Court struck it down based on the combination of the three terms.

Lord argues that both instructions contain comparable language; both contain the words "actual and substantial." However, the language of the Louisiana instruction is distinguishable from that of Nevada. Although NRS 175.211 and the instruction in this case also includes the statement that doubt must be actual and substantial, taken as a whole, the instruction gives much different meaning to the words. This court has previously considered the "substantial doubt" language of NRS 175.211, rejecting the argument that it diluted the State's burden of proof. Buckner v. State, 95 Nev. 117, 590 P.2d 628 (1979). We do not believe the Nevada definition containing the substantial doubt language alone should make it unconstitutional. The Nevada instruction does not use strong language such as "grave" or "moral certainty" to quantify the uncertainty required for an acquittal. Rather, doubt must be actual and substantial in Nevada before an acquittal should be returned. This is a much less restrictive definition of reasonable doubt than Louisiana's.

Lord similarly objects to the Nevada instruction's statement that there is no reasonable doubt if the juror has an "abiding conviction" of the truth of the charge. The Louisiana instruction on reasonable doubt did not state when a conviction should be returned, or put another way, when there is not a reasonable doubt. This is done by the Nevada standard instruction, but we do not think the "abiding conviction of the truth of the charge" language dilutes the definition of reasonable doubt or that it reduces the prosecutor's burden of proof to convict. This language in the Nevada instruction is not an attempt to quantify or define reasonable doubt, as was the language in the Louisiana instruction that the Supreme Court found objectionable.

Because the *Cage* holding is limited to the interpretation of a single Louisiana instruction that is not similar to the instruction on reasonable doubt given in Nevada, we hold that the jury instruction given in this case and NRS 175.211 satisfy the due process requirements of both the United States and the Nevada Constitution.

## LEGAL DISCUSSION OF PENALTY PHASE

1. *Denial of defendant's request for a half-day continuance.*

Lord first contends that the district court abused its discretion

in denying the defense request for a half-day continuance to permit six out-of-state witnesses from Maryland to testify the next morning. We agree.

On August 23, 1989, the Wednesday before Lord's trial, the court conducted its calendar call for this case. The trial was to start ,on the following Monday. Defense counsel informed the court that he had five or six out-of-state witnesses arriving on Thursday night of trial week who would be ready to testify in the penalty hearing on Friday morning. The judge suggested that defense counsel try to have the witnesses ready to testify by Thursday, because the guilt phase would probably be finished by Wednesday. Later in the calendar call, however, the district court recalled Lord's case. At that time, the court stated that it understood the "hazards" of transportation and that it would be "flexible" on scheduling the penalty phase. Indeed, the district judge suggested that he might continue the penalty phase until the week after the guilt phase. The next discussion of scheduling the defense penalty witnesses came on Tuesday, August 29, 1989, the second day of trial. At this time, the court made it clear that it would require all the defense witnesses for the penalty hearing to be ready to testify on Thursday.

Lord was found guilty on Wednesday evening, and the penalty hearing began at 11:30 a.m. on Thursday, August 31, 1989. Explaining that he had been unable to move up the witnesses' travel arrangements, defense counsel requested the court to allow him to present the out-of-state witnesses the next morning. The court denied this request without inquiring as to whether there was good cause for the delay. As a consequence of this denial, *the jury heard only one out of seven of Mr. Lord's planned witnesses.* The six out-of-state witnesses, *including Lord's father,* were unable to testify on ˋLord's behalf. Even without the out-of-state defense witnesses, the testimony at the penalty hearing concluded Thursday afternoon and the case was submitted to the jury at five o'clock that evening. The jury adjourned to go home at 6:30 p.m. The next day, at 9:45 a.m., the jury returned a verdict of death before another district judge, whom the presiding district judge had requested to take the verdict.

Defense counsel later filed a motion for new trial based in part on the denial of the continuance. Attached to the motion was an affidavit of Joan Coe of the public defender's office. Coe attested that, during the week of trial, she had attempted to move up the arrivals of the witnesses, but was unsuccessful. She further stated that the witnesses she was able to reach told her that their schedules would not permit change, or gave other reasons why

they could not change their travel plans. Also attached to the motion for new trial were affidavits from the witnesses themselves confirming that they had arrived on Thursday evening and were available to testify on Friday morning.

The parties agree that the granting or denial of a motion for a continuance is in the sound discretion of the district court. *See, e.g.*, Zessman v. State, 94 Nev. 28, 573 P.2d 1174 (1978); *see also* NRS 174.515. In the present case, the district judge abused this discretion by refusing to grant this reasonable request for a modest continuance. First, the prejudice to the court and the administration of justice due to what amounts to, at most, a half-day continuance appears minimal. If the six other witnesses had been present on Thursday, the proceedings would have lasted until Friday anyway, unless the district judge conducted court into Thursday evening. It is unclear why the district judge would not be in session the next morning. Second, the prejudice to the defendant was readily apparent. The court had been informed that fully five or six out of the seven defense witnesses were involved. Third, the record does not show any lack of diligence on the part of defense counsel sufficient to justify the denial. The discussion during calendar call on the previous Wednesday had left the scheduling unresolved or at least "flexible." Based on that discussion, it was not unreasonable for Mr. Lieberman to believe that the court would be willing to reschedule the penalty phase for the next week if necessary. The district judge's remarks suggested that if Lord's trial could be concluded in three days, he might be able to try another criminal case on Thursday and Friday, deferring Lord's penalty phase until the next week. Alternatively, if Lord's trial went longer than expected, then Lord's witnesses might not be required until Friday anyway. From the facts contained in the record, defense counsel did not realize that the judge would require the witnesses' presence until after the discussion on Tuesday, the second day of trial. Thus, the defense had, at most, two days to rearrange the flight plans of their witnesses from Maryland. Additionally, these were out-of-state witnesses not subject to subpoena. Finally, the judge had earlier stated that he understood the problems of transportation. Yet later, although it was shortly before the busy Labor Day weekend, the judge did not even inquire into whether, for example, the witnesses had been unable to obtain seats on earlier flights.

This court has held denials of motions for reasonable continuances to be an abuse of discretion where the purpose of the motion is to procure important witnesses and the delay is not the particular fault of counsel or the parties. *See, e.g.*, Colgain v.

State, 102 Nev. 220, 719 P.2d 1263 (1986); Banks v. State, 101 Nev. 771, 710 P.2d 723 (1985). The same considerations of fairness and substantial justice must apply with even greater force in the penalty phase of a capital case, even at the expense of some inconvenience to the calendar of the district court and, indeed, even if the delay, in some small degree, is the fault of counsel.

## 2. *Admission of co-defendant's incriminating confession during penalty phase.*

Lord further contends that it was error for the district court to allow Detective Hatch to read to the jury a transcript of McDougal's confession during the penalty phase. We agree and conclude that this was prejudicial error as to the penalty phase.

McDougal gave this confession to police *after* he and Lord were arrested. Because the confession was not made during the course of the conspiracy, the co-conspirator exception to the hearsay rule was inapplicable. *See* NRS 51.035(3)(e). Presumably for this reason, the confession was not admitted during the guilt phase, only at the penalty phase. Although McDougal had testified in his earlier, separate trial, he did not testify at any phase of Lord's trial.

Absent some hearsay exception, admitting a non-testifying co-defendant's confession against another co-defendant during the guilt phase generally violates the sixth amendment right to confrontation. Bruton v. United States, 391 U.S. 123, 137 (1968). The issue here is whether the *Bruton* rule applies to the penalty phase of a capital case as well. The admissibility under *Bruton* of a confession of a non-testifying co-defendant during the penalty phase of a capital case is a question of first impression in this state.

Lord correctly cites to two decisions of the Florida Supreme Court which hold that the rule of *Bruton* applies in the penalty phase of a capital case, as well as in the guilt phase. *See* Walton v. State, 481 So.2d 1197, 1200 (Fla. 1986), *cert. denied,* 110 S.Ct. 759 (1990) (reversing sentence of death, stating that "[t]he sixth amendment right of an accused to confront the witnesses against him is a fundamental right which is applicable not only in the guilt phase, but in the penalty and sentencing phases as well"); *accord,* State v. Gardner, 480 So.2d 91 (Fla. 1985); *see also* State v. Williams, 690 S.W.2d 517 (Tenn. 1985) (reversing finding of aggravating circumstance in penalty phase because evidence supporting this circumstance violated *Bruton*). The California Supreme Court has reached the same conclusion, stating:

"We agree that *Aranda* [People v. Aranda 407 P.2d 265 (1965)] and *Bruton* apply to the penalty phase of a criminal proceeding. The importance of the right to timely cross-examination has been sufficiently emphasized by this court and the United States Supreme Court and requires no prolonged discussion." People v. Floyd, 464 P.2d 64, 80 (Cal. 1970) (en banc) (citations omitted), *cert. denied,* 406 U.S. 972 (1972).

Without citing any authority on point, the State argues that the right of confrontation should not apply at a capital penalty phase, given the breadth of hearsay evidence admissible during penalty phase under NRS 175.552. We disagree. Although not argued here, there are some factual situations in which *Bruton* has been held not to apply. *See generally* 2 La Fave & Israel, *Criminal Procedure* § 17.2(b) (1984). Additionally, *Bruton* errors have been held to be subject to harmless error analysis. Harrington v. California, 395 U.S. 250, 254 (1968). Nevertheless, the need for cross-examination to test the fundamental *reliability* of co-defendants' often suspect statements is no less great in the penalty phase than in the guilt phase. In accord with the California Supreme Court, we conclude that the right of cross-examination and the need for accuracy are as important, indeed more important, in the penalty phase than in the guilt phase. We recognize that at least one court[2] has suggested that *Bruton* does not apply in the penalty phase, but this position is not persuasive.

The State further contends that since sentencing does not involve the question of guilt, there is less need for cross-examination. This argument is not persuasive either, because, as the State admits, the clear purpose of introducing the confession was "to alleviate any lingering doubt the jury may have had concerning their verdict of *guilt.*" (Emphasis added.) McDougal testified in his separate trial, but the cross-examination by the prosecutor in that trial was no substitute for cross-examination by Lord's defense counsel at Lord's trial.

The State further argues that any error was harmless. Again, we disagree. Here, the confession was central in cementing the State's circumstantial case in the minds of the jurors. Only two other witnesses besides Detective Hatch testified for the State in the penalty phase. Especially given Lord's lack of prior violent crimes, we cannot conclude that there was no "reasonable possibility" of a more favorable result absent this constitutional error. *See* People v. Brown, 758 P.2d 1135, 1144-45 (Cal. 1988), *cert. denied,* 109 S.Ct. 1329 (1989) (stating "reasonable possibility" standard for harmless error analysis of errors of constitutional law).

---

[2]*See* State v. Grisby, 647 P.2d 6 (Wash. 1982) (en banc).

Since we have concluded that the penalty phase must be reversed, we need not reach Lord's remaining assignments of error as to the penalty phase.

## CONCLUSION

We conclude that the errors assigned by Lord do not require reversal of the guilt phase. The penalty phase must be reversed for two reasons. First, the district court abused its discretion in denying the reasonable defense request for a half-day continuance of the penalty phase to allow out-of-state witnesses to testify on Lord's behalf, and this prejudiced Lord. Second, in a question of first impression, we hold that the rule of *Bruton* applies with equal force during the penalty phase of a capital case.

For these reasons, we affirm Lord's three convictions, and we affirm the prison sentences imposed for robbery with a deadly weapon and conspiracy to commit robbery and/or murder. We reverse the sentence of death and remand this case for a new penalty hearing before a newly impaneled jury pursuant to NRS 177.055(3)(b)(1).

MOWBRAY, C. J., SPRINGER and YOUNG, JJ., concur.

STEFFEN, J., concurring in part and dissenting in part:

I concur in all aspects of the majority opinion with the exception of the opinion's ruling concerning the *Bruton* issue in the penalty phase of Lord's trial. In my view, the issue is of sufficient importance to warrant an expression of dissent.

The ruling in Bruton v. United States, 391 U.S. 123 (1968), was directed specifically to the guilt phase of a defendant's trial and prohibited the admission of a co-defendant's confession against another co-defendant absent an applicable exception to the hearsay rule. The *Bruton* rule has retained its vitality in the context of forums constituted to determine the overriding issue of innocence or guilt because it is of critical importance that a determination of guilt occur within the degree of certitude reflected by the State's evidentiary burden of proof beyond a reasonable doubt. The right of the capital defendant to confront and cross-examine a co-defendant who may seek to minimize his own involvement at the expense of the defendant is consistent with the high qualitative demands on evidence competent for evaluation by a jury in its determination of innocence or guilt. Once a determination of guilt has been reached, however, the focus shifts to the form of punishment warranted, given the specific character and background of the defendant and the circumstances and gravity of the crime committed.

I strongly disagree with the assessment of my brethren in the majority suggesting that *Bruton* constraints are even more important to the penalty phase than in the guilt phase of a capital defendant's trial. Bifurcated guilt and penalty phase criminal trials are unique to the capital case where a sentence of death may be imposed. Absent from the penalty phase of the trial is the compelling threshold determination of innocence or guilt. Guilt has been determined, and the task facing the trier of fact is confined to an evaluation of evidence bearing upon the nature and extent of the punishment deserved by the *particular* defendant and his *particular* crime.

With respect to the nature of punishment that may be imposed under Nevada law, the jury must find, beyond a reasonable doubt, the presence of one or more statutorily defined aggravating circumstances as a requisite to the availability of death as a sentencing alternative. *See* Gallego v. State, 101 Nev. 782, 791, 711 P.2d 856, 862 (1985). When aggravating circumstances have been found to exist, the defendant is thereafter scrutinized according to his individual characteristics. *Id.* "This process is facilitated by consideration of mitigating circumstances and other reliable factors relevant to the life of the defendant as a whole person. Only then may a sentencing authority render an informed judgment based upon the crime and the defendant who committed it." *Id.* at 791, 711 P.2d at 862-63. Continuing, we declared that "[i]f the death penalty option survives the balancing of aggravating and mitigating circumstances, Nevada law permits consideration by the sentencing panel of other evidence relevant to sentence. NRS 175.552. Whether such additional evidence will be admitted is a determination reposited in the sound discretion of the trial judge." *Id.*

Under Nevada's statutory sentencing procedure for capital cases, the Legislature has provided latitude to enable juries to fully concentrate on factors related to a defendant's character and record. The language of NRS 175.552 thus provides that:

> Upon a finding that a defendant is guilty of murder of the first degree, the court shall conduct a separate penalty hearing to determine whether the defendant shall be sentenced to death or to life imprisonment with or without possibility of parole. . . . In the hearing, evidence may be presented concerning aggravating and mitigating circumstances relative to the offense, defendant or victim *and on any other matter which the court deems relevant to sentence, whether or not the evidence is ordinarily admissible . . . .*

Emphasis supplied. We have consistently recognized that the clear effect of the referenced statutory provision is to allow for the

introduction of evidence "which is otherwise inadmissible, including evidence of character and special instances of conduct" because it is "relevant to the jury's determination of the appropriate sentence for a capital crime." Pellegrini v. State, 104 Nev. 625, 630, 764 P.2d 484, 488 (1988). *See also* Emil v. State, 105 Nev. 858, 784 P.2d 956 (1989); Milligan v. State, 101 Nev. 627, 708 P.2d 289 (1985); Jones v. State, 101 Nev. 573, 707 P.2d 1128 (1985). Moreover, it is well established in Nevada that the criteria, in addition to relevance, for the admissibility of evidence in the penalty phase is that it be credible, and not dubious or tenuous. *See Jones,* 101 Nev. at 578, 707 P.2d at 1132; Biondi v. State, 101 Nev. 252, 257, 699 P.2d 1062, 1065 (1985); Allen v. State, 99 Nev. 485, 488, 665 P.2d 238, 240 (1983). It is clear to me, therefore, that "the need for accuracy" referred to by the majority, although manifestly important, is not more so in the penalty phase than the guilt phase, as declared by the majority. If the majority's premise were correct, the latitude accorded by NRS 175.552 and repeatedly recognized by this court, would be unacceptable. Instead, the statutory latitude embraces such evidence as hearsay that would be inadmissible during the guilt phase, providing the hearsay is not tenuous or dubious.

In the instant case, Detective Hatch was allowed to read to the jury a transcript of co-defendant McDougal's confession. The confession corroborated the guilty determination already reached and laid to rest by the jury in the guilt phase of Lord's trial. The State successfully sought the introduction of McDougal's confession in order to solidify the jury's conviction concerning Lord's guilt. The trial judge obviously viewed the confession as both credible and probative and a less than tenuous source of detail concerning the commission of the crime. Under our prior rulings cited above, the trial judge had the discretion to either admit or exclude the confession, and I am of the opinion that there is an inadequate basis for this court to conclude that the trial court's ruling constituted an abuse of its discretion. Moreover, I agree with the Washington Supreme Court's determination that *Bruton* does not apply to the penalty phase of a capital case. *See* State v. Grisby, 647 P.2d 6 (Wash. 1982) (en banc).

There is an additional reason why *Bruton* should not apply to penalty hearings, at least under Nevada law. In Nevada, if a trial judge views the State's evidence as being insufficient to convict, the judge may issue a non-binding advisory instruction to acquit. If, after a verdict of guilty, the trial judge disagrees with the jury's resolution of conflicting evidence, the judge may grant the defendant a new trial. A post-verdict ruling on the sufficiency of the evidence must be addressed to this court for disposition on appeal. *See* State v. Wilson, 104 Nev. 405, 760 P.2d 129 (1988).

In the instant case, there was no advisory verdict, no granting of a new trial, and no determination by this court on appeal that the evidence considered by the jury was insufficient to support its verdict. It is apparent, therefore, that Lord's guilt has been finally determined. It was so determined by the trial court when it permitted the trial to proceed to a penalty phase without issuing an advisory instruction or granting a new trial.

Given the fact that the trial court did not see fit to intervene in the jury's determination of Lord's guilt, it seems proper to me that the court allowed the co-defendant's confession as further corroboration of the correctness of the jury's guilty verdict. The confession merely reinforced what the jury had already placed to rest, and thereby enabled the jury to focus with greater precision on the legitimate purposes of its penalty-phase deliberations. Indeed, when the matter is considered anew upon remand by a different jury, the jury will necessarily be informed that Lord's guilt has been determined and may not be reconsidered. *See* Jimenez v. State, 106 Nev. 769, 801 P.2d 1366, (1990) (because guilty verdict was affirmed on appeal, defense counsel was not entitled to argue capital defendant's innocence during new penalty hearing). The effect of such an instruction to the new jury will be essentially the same as hearing the confirmation of guilt through the co-defendant's confession. I must therefore conclude that the *Bruton* rule has no place in the penalty hearing where the co-defendant's confession would have no bearing on a determination of innocence or guilt.

For the reasons specified above, I respectfully dissent from that part of the majority's ruling that applies *Bruton* error to a penalty phase of a capital case. In all other respects, I concur that judgment was properly entered pursuant to a jury verdict of guilty, and that the sentence of death must be vacated and the matter remanded for a new sentencing hearing where Lord's witnesses may be heard on his behalf.