*1073 OPINION

Per Curiam:

Roderick Tyrone Abeyta (“Abeyta”) was found guilty of burglary, robbery with use of a deadly weapon, and murder with use of a deadly weapon, all in connection with the shooting death of Donna Martin.
After a penalty hearing on the murder conviction, the jury voted to impose the death penalty. In addition, the trial court sentenced Abeyta to fifteen years in the Nevada Department of Prisons for robbery, an additional fifteen years for the weapon enhancement, and ten years for burglary. All sentences were imposed consecutively. Abeyta now appeals.

FACTS

During the late night or early morning hours of October 20-21, 1989, Donna Martin was fatally shot in the head at close range as she lay sleeping in her apartment at 740 North Ninth Street, Las Vegas, Nevada. Abeyta had been involved with Martin during a temporary estrangement from his wife, Barbara Abeyta (hereinafter “Barbara”).
Abeyta and Barbara were married for about five years when, sometime in 1989, they began experiencing marital difficulties. Abeyta moved out of their apartment on East Bonanza Road in Las Vegas, and moved in with Martin for about one month. Shortly before Martin’s demise, Abeyta and Barbara reconciled and he moved back to the marital residence. It is undisputed that these relationships were quite tumultuous.
Evidence introduced at trial indicates that, after a brief visit to family in the state of Minnesota, Abeyta returned to Las Vegas on *1074 October 16, 1989, with his half-brother, Casey Korsmo, and a .25 caliber semi-automatic handgun.
On the night preceding the murder, Abeyta confronted Vicky Sherman, Martin’s former roommate, at a local bar. Abeyta angrily inquired as to why they had told Barbara of his affair with Martin. Sherman testified to threats by Abeyta that Martin and Sherman were going to “get what was coming to [them]” and that she and Martin would end up with bullets “in their brains.”
Korsmo, the State’s primary witness, testified to the following account. Abeyta and Barbara had argued at their apartment on the night of Martin’s murder. Barbara then sedated herself with Percodan, after which Korsmo and Abeyta left to purchase liquor. After about an hour, they went to Martin’s house, initially with the intention of purchasing narcotics. They parked one-half to three-quarters of a block away, approached Martin’s front door, knocked and looked in. Although no one answered, Korsmo could see someone’s feet at the end of a couch located in the apartment living room. At that point, Abeyta allegedly said that he wanted to rob Martin of drugs he believed were in the house. Abeyta also told Korsmo that Martin had become a problem to his household and that “he’d just like to really hurt her sometimes.” Korsmo was unaware at the time that Abeyta was carrying a handgun.
Both men entered the apartment after breaking a bedroom window in the back of the house. Before entering, Abeyta told Korsmo that Martin would be “sleeping heavy” because she had been awake for three or four days on crank (methamphetamine). As Korsmo stood by the bedroom window in the darkened house, Abeyta went through the apartment. Sometime later, Abeyta returned to the bedroom with a satchel-like purse and a checkbook. Korsmo subsequently learned that some brass owl figurines and a “little teapot-looking thing” had been taken.
Korsmo went on to testify that, upon returning with the purse and other items, Abeyta told him to return to the car. This order notwithstanding, Korsmo chose to remain inside the house by the bedroom window. At that point, Abeyta went back to the living room area. As Korsmo waited, he could hear Abeyta quietly cursing because he could not find the drugs. Korsmo then heard two gunshots. Shortly thereafter, both men exited the house through the window. Once inside the car, Abeyta said, “I killed the bitch and if you tell anybody I’ll kill you, too.” Abeyta also described the actual killing by saying that he sat on Martin’s back as she laid on her stomach, grabbed her by the hair, told her he would get her, and then shot her.
After returning to Abeyta’s apartment and ingesting methamphetamine, Abeyta and Korsmo again left for a period of hours *1075 during which Abeyta burglarized several mobile homes while Korsmo waited in the car. Items taken during these later events included collector’s plates and an antique clock. Korsmo testified that they returned to Abeyta’s apartment at about 6:00 a.m. on October 21.
According to Barbara, at approximately 3:00 a.m. on October 21, she awoke to find Abeyta and Korsmo entering their apartment with various items. These included a clock with chimes, a huge mosaic, a “pink-looking” clock, plates depicting birds and wildlife, and numerous brass items consisting of bells, scissor holders, owls, clowns and a teapot. Abeyta told his wife that the items had been obtained in exchange for a $250 debt.
Barbara went on to testify that, on October 23, 1989, Abeyta placed a plastic bag containing the handgun and a buck knife into her rented storage unit. Then, on October 24, 1989, Barbara learned of Martin’s death. Becoming suspicious, she contacted Sherman to determine what had been stolen from Martin’s residence. Sherman advised that among the missing items were some brass objects and a buck knife. Barbara then contacted the Las Vegas Metropolitan Police Department “Secret Witness” program. After taking Barbara’s information and accompanying her to the storage unit to retrieve the plastic bag, handgun and buck knife, the police arrested Abeyta on the aforementioned charges.
Other testimony came from Diane Guitterriz, an acquaintance of Abeyta. She testified that her trailer was burglarized on the evening of the murder. Missing were brass items, plates depicting dogs, birds and different wildlife scenes, an anniversary clock, a 110-year-old Seth Thomas mantle clock and clown figurines.
The jury convicted Abeyta on all charges and unanimously voted to impose the death penalty. Abeyta appeals, claiming that the robbery conviction is infirm; that certain communications by the jurors to the district court via five “jury notes” violated his right to be present at critical stages of the proceedings; and that the jury was improperly instructed on malice, premeditation and reasonable doubt.

DISCUSSION

Robbery

Count II of the Information, which charged Abeyta with robbery with use of a deadly weapon, reads as follows:
[Defendant] did between October 20, 1989, and October 21, 1989, then and there wilfully, unlawfully, and feloniously take personal property, to-wit: one (1) brass teapot, one (1) brass bell, (1) brass scissors in a holder, three (3) brass owls and a purse and contents, from the person of DONNA MARTIN, or in her presence, by means of force or vio *1076 lence, or fear of injury to, and without the consent and against the will of the said DONNA MARTIN, said Defendant using a deadly weapon, to-wit: a firearm, during the commission of said crime.
Abeyta argues that the robbery conviction should be overturned because it was not supported by sufficient evidence and because the State did not, as a matter of law, establish all of the elements of robbery.
When sufficiency of the evidence is challenged on appeal in a criminal case, “[t]he relevant inquiry ... is ‘whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.’ ” Koza v. State, 100 Nev. 245, 250, 681 P.2d 44, 47 (1984) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original)). Where there is sufficient evidence to support the jury’s verdict, it will not be disturbed on appeal. Cunningham v. State, 94 Nev. 128, 130, 575 P.2d 936, 937 (1978).
Abeyta contends that it was unclear whether the items Korsmo and Abeyta took were from Martin’s apartment or Guitterriz’s mobile home, thus clouding the jury’s ability to find him guilty beyond a reasonable doubt.
He points to the testimony of Lois Gonnelly, an acquaintance of Guitterriz, during which Gonnelly identified several of the recovered items as being taken from Guitterriz’s trailer; whereas, Sherman identified some of the same objects as belonging to Martin. Abeyta also refers to the fact that Barbara listed several items taken from Guitterriz as having been at her apartment at 3:00 a.m. on October 21, 1989, while Korsmo stated that these items were not taken until later that morning.
Although there was some confusion in this regard, the jury could reasonably have resolved these questions beyond a reasonable doubt in favor of a theft having occurred at Martin’s apartment. Sherman identified several articles as belonging to Martin. Most notable were the brass scissors and three brass owls. Sherman also testified that the police recovered a brass teapot “exactly like the one that was in [Martin’s] home.” Although Sherman was unable to tie many of the stolen items to Martin, she confirmed that several of the items identified by Barbara belonged to Martin.
We therefore hold that Abeyta’s conviction for robbery is supported by sufficient evidence.
*1077 Abeyta also claims that the State failed to establish each of the statutory elements necessary to uphold a conviction for robbery. NRS 200.380 states, in pertinent part:
1. Robbery is the unlawful taking of personal property from the person of another, or in his presence, against his will, by means of force or violence or fear of injury, immediate or future, to his person or property, or the person or property of a member of his family, or of anyone in his company at the time of the robbery. A taking is by means of force or fear if force or fear is used to:
(a) Obtain or retain possession of the property;
(b) Prevent or overcome resistance to the taking; or
(c) Facilitate escape.
The degree of force used is immaterial if it is used to compel acquiescence to the taking of or escaping with the property. A taking constitutes robbery whenever it appears that, although the taking was fully completed without the knowledge of the person from whom taken, such knowledge was prevented by the use of force or fear.
(Emphasis added.)
Abeyta argues that, as a matter of law, Korsmo’s account of the events at Martin’s residence proved only that a burglary,[1] as opposed to robbery, occurred. Abeyta maintains that, because Martin was sleeping at the time of the killing, the State failed to prove beyond a reasonable doubt that Martin had knowledge of the taking or that her knowledge was prevented by the use of force.
In Sheriff v. Jefferson, 98 Nev. 392, 649 P.2d 1365 (1982), this court upheld a conviction for robbery where the victim was able to escape from her vehicle before the defendant took her purse from the car. We stated that “a taking constitutes robbery even if the taking is fully completed without the victim’s knowledge, if such knowledge is prevented by the use of force or fear.” Id. at 394, 649 P.2d at 1366-67.
Unlike the scenario in Jefferson, the use of force in this matter, i.e., the murder, took place after Martin’s personal property had been removed from her presence.
*1078 We agree with the proposition that a taking constitutes a robbery where the use of force follows the taking, and where the forcible conduct is part of a continuous transaction. See State v. Holt, 917 P.2d 1332, 1339 (Kan. 1996); State v. Comer, 799 P.2d 333, 341 (Ariz. 1990), cert. denied, 499 U.S. 943 (1991) (noting that “a robbery may also be established when the use of force follows the actual taking of property, so long as the use of force is accompanied with the intent to take another’s property”).
Thus, we conclude that a reasonable jury could find that Martin’s knowledge of the taking of her property was prevented by the use of deadly force. Most notably, Abeyta went back to kill Martin before removing her personal property from the residence. Thus, Abeyta’s actions in this matter satisfied the elements of a robbery as opposed to burglary.

Jury Notes

Abeyta argues that his right to be present at all critical stages of the trial, and his right to a fair trial and an impartial jury, were frustrated by the manner in which the judge resolved five notes sent to the trial judge by the jury during the guilt phase of the trial. After carefully reviewing the record, we conclude that the trial court’s interaction with the jury regarding the notes was neither ex parte nor prejudicial. We will address each note in turn.
A jury member sent the first note to the judge during the testimony of the first witness in the case. The note asks: “Who lives E Bonanza.” The judge simply indicated on the record that the jury had sent a note requesting “some information” and stated to the jury, without answering the question, that most questions they might have would be answered through other witnesses. Abeyta argues that the judge did not advise counsel of the contents of the note and did not answer the question. Abeyta contends that the question was relevant to the robbery charge.
Although the attorneys were free to make inquiry regarding the contents of the note, none was made of record. See McCullough v. State, 99 Nev. 72, 74, 657 P.2d 1157, 1158 (1983) (holding that failure to object at trial will bar review of issue on appeal). Further, this problem was evident to counsel because “when and what was taken from where” was one of the primary questions litigated in connection with the robbery charge. Given the attention that was paid to this issue during the trial, the court’s failure to answer the question for the jury is inconsequential. See NRS *1079 178.598 (any irregularity or variance which does not affect substantial rights shall be disregarded); see also Farmer v. State, 95 Nev. 849, 853, 603 P.2d 700, 703 (1979). In any case, the court need not answer all questions because, until juries are given the right to ask questions of witnesses and counsel, jury trials are not interactive to the extent Abeyta impliedly suggests.
Note three,[2] submitted on the third day of a four-day trial, requested clarification as to whether Abeyta was being tried for robbery as well as murder: “I’m sorry for not being clear on this, but are we trying Mr. Abeyta for robbery as well as murder, or just for murder?”
In response, the judge indicated that the issue would become clear later in the proceedings. Abeyta argues that the note indicated jury confusion as to the charges which should have been resolved at that point. We find that this argument is meritless; the jury was given complete instructions on the crimes charged at the conclusion of the evidence and Abeyta was unanimously convicted of the robbery charge. See Roland v. State, 96 Nev. 300, 301-02, 608 P.2d 500, 501 (1980).
The fourth note requested a clarification of the “hearsay” rule. It states: “Judge — Could you please explain to us the difference between ‘heresay,’ [sic] & a witness fully answering a question. (When a witness states ‘he said’ or ‘she said?!) Thank you — ”
In response, the judge indicated on the record that the jury was not to be concerned with his evidentiary rulings, and that the jury was to decide the facts based on the law that was to be set forth at the end of the case in the jury instructions. Abeyta argues that his counsel was not advised of the note’s existence. First, the record in its entire context suggests that counsel were present. Second, this interchange is of no consequence. See Kazalyn v. State, 108 Nev. 67, 71, 825 P.2d 578, 581 (1992).
Note five reads as follows: “There were several finger-print cards entered as evidence — were the finger-prints on those cards identified as the defendant’s — or someone elses?” The record does not reflect the judge’s reaction to this note. While Abeyta concedes that the trial court may have responded to note five, he contends that the trial court might also have addressed this note to the jury ex parte or, alternatively, may have ignored it all together.
*1080 There is no indication in the record that Abeyta’s complaints regarding this note have any merit. The record regarding the fingerprint evidence indicates that all of the cards were identified, the jury was advised that not all latent “lifts” will result in a match, and that all of the positive comparisons were revealed to the jury. Thus, as with the other arguments addressing these notes, reversible error has not been established. Accordingly, there is no need to analyze the trial court’s interaction with the jury under Isbell v. State, 97 Nev. 222, 626 P.2d 1274 (1981).[3]

Jury Instructions

Abeyta attacks the trial court’s instructions on malice, premeditation and reasonable doubt. It is this court’s responsibility to ensure that the jury instructions stated existing law. Barron v. State, 105 Nev. 767, 773, 783 P.2d. 444, 450 (1989). Having completed our analysis under Barron, we conclude that Abeyta’s assignments of error regarding these instructions have previously been addressed by this court and rejected. See Evans v. State, 112 Nev. 1172, 1191-92, 926 P.2d 265, 278 (1996); Wesley v. State, 112 Nev. 503, 916 P.2d 793 (1996); Witter v. State, 112 Nev. 908, 917-18, 921 P.2d 886, 893 (1996); Guy v. State, 108 Nev. 770, 776-77, 839 P.2d 578, 582-83 (1992), cert. denied, 507 U.S. 1009, 113 S. Ct. 1656 (1993); Lord v. State, 107 Nev. 28, 38-40, 806 P.2d 548, 552 (1991).
In addition to the foregoing, we also find that the death sentence was not imposed under the influence of passion, prejudice, or any arbitrary factor, and that the evidence supports the finding of aggravating circumstances. NRS 177.055(2)(b); NRS 177.055(2)(c). Further, considering both the gravity of this offense and the defendant, we find that the death sentence is not excessive in this case. NRS 177.055(2)(d).
We have carefully reviewed Abeyta’s other assignments of *1081 error and conclude they are without merit. Accordingly, the judgment of conviction is affirmed in its entirety.

 NRS 205.060(1) reads as follows:
A person who, by day or night, enters any house, room, apartment, tenement, shop, warehouse, store, mill, barn, stable, outhouse or other building, tent, vessel, vehicle, vehicle trailer, semitrailer or house trailer, airplane, glider, boat or railroad car, with the intent to commit grand or petit larceny, assault or battery on any person or any felony, is guilty of burglary.

 Abeyta concedes that the second note and the circumstances surrounding it are without consequence.

 In Isbell, this court stated:
Any private communication with a juror in a criminal case on any subject connected with the trial is presumptively prejudicial. . . . The burden is on the respondent to show that these communications had no prejudicial effect on the jurors. ... A hearing before the trial court is the proper procedure to determine whether a communication is or is not prejudicial.
Id. at 226, 626 P.2d at 1276-77 (citing Remmer v. United States, 347 U.S. 227 (1954); Conforte v. State, 77 Nev. 269, 362 P.2d 274 (1961); Parsons v. State, 74 Nev. 302, 329 P.2d 1070 (1958)).