BRIAN ROSE, APPELLANT, *v.*
THE STATE OF NEVADA, RESPONDENT.

No. 53813

July 21, 2011                                                 255 P.3d 291

[Rehearing denied September 29, 2011]

*David M. Schieck*, Special Public Defender, and *JoNell Thomas*, Deputy Special Public Defender, Clark County, for Appellant.

*Catherine Cortez Masto*, Attorney General, Carson City; *David J. Roger*, District Attorney, *Stephen S. Owens*, Chief Deputy District Attorney, and *Sonia V. Jimenez*, Deputy District Attorney, Clark County, for Respondent.

---

[3]Given our resolution, we need not reach Winkle's remaining contentions.

Before Douglas, C.J., Pickering and Hardesty, JJ.

## OPINION

By the Court, Douglas, C.J.:

In this appeal, we address whether a charge of assault with a deadly weapon merges with a charged homicide so that it cannot be used as the basis for second-degree felony murder. To maintain the narrow confines of second-degree felony murder, wherein the felonies that can be used to support a conviction are not statutorily enumerated and the use of the felony-murder rule has "the potential for untoward prosecutions," *Sheriff v. Morris*, 99 Nev. 109, 118, 659 P.2d 852, 859 (1983), we hold that assaultive-type felonies that involve a threat of immediate violent injury merge with a charged homicide for purposes of second-degree felony murder and therefore cannot be used as the basis for a second-degree felony-murder conviction. Whether the felony is assaultive must be determined by the jury based on the manner in which the felony was committed. Because the crime at issue here, assault with a deadly weapon, could be assaultive based on the manner in which it was committed, we conclude that the district court erred when it failed to instruct the jury to determine whether the felony underlying the second-degree felony-murder theory was assaultive based on the manner in which the felony was committed. We further conclude that the error was not harmless beyond a reasonable doubt. Accordingly, we reverse the judgment of conviction and remand this case for further proceedings consistent with this opinion.

### FACTS

Appellant Brian Rose was convicted of second-degree murder with the use of a deadly weapon for shooting his girlfriend, Jackie Watkins, in the head. On the day of the killing, Rose and his friend, Jake Timms, went target shooting in the desert with Rose's .40 caliber Smith & Wesson semiautomatic handgun. Afterwards, they picked up Watkins and went to a barbeque at the home of another friend, Julius Castano. Rose brought the gun inside the house and placed it in the family room because he claimed he feared someone might break into his car and steal his registered gun.

Throughout the evening, Rose, Timms, and Julius handled the gun. At one point, Rose took the magazine out of the gun and pulled the slide back to make sure the chamber was empty. Timms took the gun and put it in a holster on his hip. After eating dinner and drinking, Rose, Watkins, Timms, and Julius retired to the living room. Timms eventually fell asleep on the couch with the gun still in the holster around his waist. At some point Rose took the gun from the sleeping Timms and placed it in his waistband.

Later in the evening, Rose shot Watkins in the head while she spoke on the phone to her friend Erin Fragoso. Fragoso called Watkins and the two spoke briefly. According to Rose's voluntary statement to police, he aimed the gun at or near Watkins while she was talking to Fragoso and told her to get off the phone. He then shot a single round from his gun and hit the top of Watkins' head. Fragoso could hear Rose's voice in the background and could tell that it was firm and forceful, but she could not hear his exact words. Fragoso ended the call after a long silence from Watkins; she did not hear a gunshot.

Although witnesses in the home heard the gunshot, none of them saw Rose fire the gun. Julius's father, Joseph Castano, was upstairs in his room at the time and heard laughing from downstairs right before the gunshot was fired. Julius heard the gunshot and turned around to see Watkins on the couch, not moving. Rose was standing right next to Watkins with the gun in his hand. Julius testified that "there was no stiff pointing the gun at nobody . . . . It was in [Rose's] hand like he wanted me to take it from his hands." Julius took the gun from Rose, and Rose left the house in his car. Joseph checked Watkins and directed his son to call 911.

Officers arrived quickly at the home and noted that Watkins was positioned as if she was still talking on the phone. Medical personnel took Watkins to the hospital where she died from deprivation of blood to the brain. At the Castano home, officers found an ejected cartridge on the floor against the wall, behind a couch. Officers also found Rose's loaded Smith & Wesson handgun upstairs in a bedroom.

A police officer located Rose, who was driving at speeds approaching 100 miles per hour, and followed him but did not pull him over. Rose pulled over voluntarily, exited his car, and was taken into custody. Upon his arrest, the police read Rose his *Miranda* rights, and he was interviewed by Las Vegas Metropolitan Police Department homicide detectives. Rose admitted to knowing how to use his gun and knowing that the gun had no hammer. Rose told the detectives that he did not know his gun was loaded and that he accidentally shot Watkins. He also told them that he considered fleeing to Mexico. When the detectives asked Rose if he intended to shoot Watkins, he responded, "God no."

Rose acknowledged that he must have pulled the trigger when he turned, but there was no witness testimony presented that Rose

purposefully aimed and fired at Watkins. In his voluntary statement to detectives, Rose claimed that he had pointed the gun at the chair next to Watkins to be "a dick." He said he gave Watkins "a squinted look" and smiled to let her know he was playing around. Rose stated that he "looked back the other way and, and then when [he] looked back, that's when it actually went off." Rose asserted that he did not care whether Watkins got off the phone or not, and, at the time, he believed the gun was empty. At the end of the interrogation, the detectives told Rose that Watkins died, and Rose became very upset and cried.

Rose was charged with one count of murder with use of a deadly weapon. Rose pleaded not guilty and filed a petition for a writ of habeas corpus with the district court challenging the probable cause to support the indictment. The district court denied the petition. Next, Rose filed a pretrial motion asking the district court to strike the second-degree felony-murder theory and disallow the State from presenting any instructions on such a charge. Specifically, Rose asked the court to apply the merger doctrine, arguing that "assault with a deadly weapon cannot support a murder conviction under the second-degree felony-murder rule because to allow that would alleviate the State from ever having to prove intent to kill in all cases wherein a killing results from a felonious assault." The district court denied Rose's motion and permitted the State to argue this theory.

The case went to trial with Rose continuing to challenge the State's pursuit of a murder conviction. During the settling of jury instructions, Rose requested the first-degree murder charge be stricken from the instructions, arguing that since the State declared it was seeking a second-degree murder conviction during its opening statement, it had conceded that there was no evidence of premeditation and deliberation that would subject him to first-degree murder. The State countered Rose's claim, arguing that there was evidence of premeditation and deliberation, and it had not conceded it by arguing second-degree murder during its opening statement. The district court denied Rose's motion. Rose further objected to all jury instructions concerning murder, and the district court overruled each objection.

Ultimately, the jury returned a general verdict finding Rose guilty of second-degree murder with the use of a deadly weapon. Rose filed a motion to set aside the guilty verdict or, in the alternative, for a new trial. The district court denied Rose's motion, stating it would not have been shocked if the jury returned either a manslaughter or second-degree murder verdict. Rose was sentenced to 10 to 25 years in prison, plus an equal and consecutive term for the use of a deadly weapon. Rose now appeals from his judgment of conviction.

## DISCUSSION

The record indicates that the State relied on the felony-murder rule as one of its theories for second-degree murder. During closing argument, the State argued that malice could be established in four ways: (1) express malice (intent to kill), (2) implied malice (reckless disregard of consequences and social duty), (3) felony murder based on assault with a deadly weapon, and (4) commission of an unlawful act that naturally tends to destroy the life of a human being. It argued that if the killing occurred during "the prosecution of committing a felony," specifically, assault with a deadly weapon, the crime was second-degree murder. This argument was consistent with the jury instruction the district court gave regarding involuntary manslaughter and second-degree murder.[1]

On appeal, Rose contends that assault with a deadly weapon cannot be used as a predicate felony to obtain a second-degree murder conviction under the felony-murder rule because it merges with the homicide and thus is barred by the merger doctrine. He

---

[1]Instruction No. 17 given at Rose's trial stated:

> Involuntary Manslaughter is the killing of a human being, without any intent to do so, in the commission of an unlawful act or a lawful act which probably might produce such a consequence in an unlawful manner.
>
> Where the involuntary killing occurs in the commission of an unlawful act, which, in its consequences, naturally tends to destroy the life of a human being, or is committed in the prosecution of a felonious intent, the offense is Second Degree Murder.
>
> In order for a killing committed in the prosecution of a felonious intent to be Second Degree Murder, the following must be established by the evidence:
>
> (1) The unlawful act is inherently dangerous in the abstract, i.e., without reference to the specific victim.
>
> (2) There must be an immediate and causal relationship between the unlawful act of the defendant and the death of the victim. The term "immediate" means without the intervention of some other source or agency, and
>
> (3) The causal relationship must extend beyond the unlawful act and to his involvement by commission or omission in the means of the killing.

The first two paragraphs of this instruction encompass NRS 200.070, which defines involuntary manslaughter and "distinguishes manslaughter from murder by referring to the factors which indicate malice, a required element of murder." *Barton v. State*, 117 Nev. 686, 695, 30 P.3d 1103, 1109 (2001), *overruled on other grounds by Rosas v. State*, 122 Nev. 1258, 147 P.3d 1101 (2006). The remaining portions of the instruction include the elements of second-degree felony murder as explained in *Morris*, 99 Nev. 109, 659 P.2d 852. We note, however, that the instruction's focus on whether the felony was inherently dangerous in the abstract is inconsistent with our recent decision in *Ramirez v. State*, which holds that the focus is on the "manner in which the felony was committed." 126 Nev. 203, 207-08 n.2, 235 P.3d 619, 622 n.2 (2010).

contends that the State's reliance on this theory, and the concomitant instructions given regarding second-degree felony murder, were therefore improper.

## Standard of review

"The district court has broad discretion to settle jury instructions, and this court reviews the district court's decision for an abuse of that discretion or judicial error." *Crawford v. State*, 121 Nev. 744, 748, 121 P.3d 582, 585 (2005) (citing *Jackson v. State*, 117 Nev. 116, 120, 17 P.3d 998, 1000 (2001)). Here, the instructional error involves a question of law, and we therefore review the instruction for judicial error. *Jackson*, 117 Nev. at 120, 17 P.3d at 1000. When the jury has been given an erroneous instruction, we will not reverse the judgment of conviction if the error is harmless. *Santana v. State*, 122 Nev. 1458, 1463, 148 P.3d 741, 745 (2006). An erroneous instruction on the elements of an offense "is harmless when it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Allred v. State*, 120 Nev. 410, 415, 92 P.3d 1246, 1250 (2004) (internal quotations omitted).

## Second-degree felony murder

The felony-murder rule makes a killing committed in the course of certain felonies murder, without requiring the State to present additional evidence as to the defendant's mental state. *See State v. Contreras*, 118 Nev. 332, 334, 46 P.3d 661, 662 (2002). The rule takes two forms in Nevada: first-degree felony murder and second-degree felony murder. The Legislature has specified the felonies that provide the malicious intent necessary to characterize a killing as first-degree murder. NRS 200.030(1)(b); *Contreras*, 118 Nev. at 334, 46 P.3d at 662. In contrast, there are no statutorily enumerated felonies with respect to second-degree felony murder, which is based on the involuntary manslaughter statute (NRS 200.070) and the murder statute (NRS 200.030(2)). *Ramirez*, 126 Nev. at 206, 235 P.3d at 622; *see also Morris*, 99 Nev. 109, 659 P.2d 852. When read together, those statutes broadly provide that killings occurring in the commission of an unlawful act that naturally tends to destroy human life or committed in the "prosecution of a felonious intent" are murder and, unless the murder is committed in a manner that satisfies NRS 200.030(1), are murder of the second degree. Despite that broad language, this court has placed restrictions on the use of the felony-murder rule to establish second-degree murder in order to avoid the potential for "untoward" prosecutions that a broad application of the felony-murder rule would allow. *Morris*, 99 Nev. at 118, 659 P.2d at 859. In particu-

lar, we have required that "two elements [be] satisfied: (1) . . . 'the [predicate] felony [must be] inherently dangerous, where death or injury is a directly foreseeable consequence of the illegal act,' and (2) . . . 'there [must be] an immediate and direct causal relationship—without the intervention of some other source or agency—between the actions of the defendant and the victim's death.' " *Ramirez*, 126 Nev. at 207, 235 P.3d at 622 (third alteration in original) (quoting *Labastida v. State*, 115 Nev. 298, 307, 986 P.2d 443, 448-49 (1999)). The question presented by Rose is whether we should further narrow the use of the felony-murder rule to establish second-degree murder by applying the merger doctrine.

### *Application of the merger doctrine*

The merger doctrine developed in the felony-murder context as a means of restricting the scope of the felony-murder rule, particularly when it is used to support a second-degree murder conviction. *People v. Sarun Chun*, 203 P.3d 425, 434 (Cal. 2009). "The merger doctrine developed due to the understanding that the underlying felony must be an independent crime and not merely the killing itself. Thus, certain underlying felonies 'merge' with the homicide and cannot be used for purposes of felony murder." *Id.* at 434-35.

This court has considered the merger doctrine in the context of first-degree felony murder. In *Contreras*, 118 Nev. 332, 46 P.3d 661, we considered whether the merger doctrine precluded the State from pursuing a first-degree felony-murder charge based on the underlying felony of burglary with the intent to commit battery. This court recognized that it had traditionally applied the merger doctrine only when an offense is included within another offense and had refused to apply the merger doctrine in determining whether "double jeopardy applies to a prosecution for both felony murder and the underlying felony." *Id.* at 337, 46 P.3d at 664. After considering a California decision adopting the merger doctrine to preclude a first-degree felony-murder charge based on the underlying felony of burglary with the intent to commit assault, *People v. Wilson*, 462 P.2d 22 (Cal. 1969), *overruled by People v. Farley*, 210 P.3d 361 (Cal. 2009), we declined to apply the merger doctrine to first-degree felony murder when the underlying felony was burglary with the intent to commit battery. *Contreras*, 118 Nev. at 337, 46 P.3d at 664. In doing so, we emphasized the fact that the Legislature had specifically included burglary as a felony that supports first-degree felony murder regardless of the intent underlying the burglary, and that we were reluctant to depart from the Legislature's intent in that respect. *Id.*; *accord Farley*, 210 P.3d at

409-11. However, *Contreras* did not address the merger doctrine in the context of second-degree felony murder. We do so now.

The merger doctrine was first articulated and applied to second-degree felony murder in California in *People v. Ireland*, 450 P.2d 580 (Cal. 1969). *See also State v. Essman*, 403 P.2d 540 (Ariz. 1965); *State v. Severns*, 148 P.2d 488 (Kan. 1944); *People v. Moran*, 158 N.E. 35, 36 (N.Y. 1927); *People v. Wagner*, 156 N.E. 644 (N.Y. 1927); *State v. Branch*, 415 P.2d 766 (Or. 1966). The issue arose in *Ireland* in response to a trial court instruction allowing second-degree felony murder based on assault with a deadly weapon as the predicate felony. 450 P.2d at 590. The California Supreme Court held that such an instruction was improper because "[t]o allow such use of the felony-murder rule would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assault—a category which includes the great majority of all homicides." *Id.*

Recently, in *Sarun Chun*, the California Supreme Court further clarified when an underlying felony merges with murder in the context of second-degree felony murder. 203 P.3d 425. It plainly stated that an underlying felony that is assaultive in nature necessarily merges with the homicide and cannot be the basis for a second-degree felony-murder instruction. *Id.* at 443. The court went on to define an assaultive felony as any felony that involves a threat of immediate violent injury. *Id.* "Accordingly, if the elements of the crime have an assaultive aspect, the crime merges with the underlying homicide even if the elements also include conduct that is not assaultive." *Id.* The *Sarun Chun* court declined to enumerate which felonies are assaultive but held that shooting at an occupied vehicle is assaultive and cannot be used as the underlying felony to support a second-degree felony-murder charge; therefore, it concluded that the trial court erred in instructing the jury on second-degree felony murder. *Id.*

We have not always followed California's example with regard to the applicability of the merger doctrine to the felony-murder rule. As noted above, we rejected a California case in refusing to apply the merger doctrine to a first-degree felony-murder charge that was based on burglary with the intent to commit battery. *Contreras*, 118 Nev. at 337, 46 P.3d at 664. One of the primary reasons we declined to follow California's example was our recognition that the Legislature had specified the felonies that can be used for purposes of establishing first-degree felony murder. NRS 200.030(1)(b). We noted that it is not this court's role to "override the [L]egislature's determination that [a certain felony] should be one of the enumerated felonies appropriate to elevate a homicide to felony murder." *Contreras*, 118 Nev. at 337, 46 P.3d at 664; *ac-*

*cord Farley*, 210 P.3d at 409-11. But the Legislature has not specified the felonies that can be used for purposes of second-degree felony murder, and absent such clear direction, we are convinced that the merger doctrine has a worthwhile place in restricting the scope of the second-degree felony-murder rule to avoid the potential for "untoward" prosecutions that has led us to restrict the rule in other ways. *See Ramirez*, 126 Nev. at 206-07, 235 P.3d at 622 (requiring that the felony supporting second-degree felony murder be inherently dangerous and that there be a direct causal relationship between defendant's actions and victim's death); *Morris*, 99 Nev. 109, 659 P.2d 852.

We are persuaded by the California Supreme Court's reasoning that allowing assaultive-type felonies to form the basis for a second-degree murder conviction based on the felony-murder rule would mean that virtually every homicide would occur in the commission of a felony and therefore be murder, unless otherwise justifiable or excusable or committed upon a sudden irresistible impulse. *See Sarun Chun*, 203 P.3d at 435; *Ireland*, 450 P.2d at 590; *accord Moran*, 158 N.E. at 36 (addressing felony-murder rule and holding that felonious assault that culminated in homicide could not be used to apply the felony-murder rule because the result would be that almost every homicide would be committed in the course of a felony so that no further evidence of intent would ever be required for a murder conviction; therefore, the felony "must be one that is independent of the homicide and of *the assault merged therein*" (emphasis added)). However, we are mindful of the differences between the second-degree murder statutes in California and Nevada.

Under our decision today, the application of the merger doctrine turns on a determination of whether the underlying felony is assaultive in nature. We therefore also must determine whether that question presents a factual determination for the jury or a legal determination for the trial court. We faced a similar decision as to the question of whether a felony is inherently dangerous for purposes of second-degree felony murder. Recently, in *Ramirez v. State*, we abandoned earlier cases that had suggested that that question is a legal one to be determined in the abstract based on the elements of the underlying felony; we instead held that the jury must determine whether the felony underlying a second-degree felony-murder charge is inherently dangerous based on the manner in which the felony was committed. 126 Nev. at 207, 235 P.3d at 622 n.2. In applying the merger doctrine, we are similarly persuaded that the jury should determine whether the underlying felony is assaultive—*i.e.*, involves a threat of immediate violent injury—based on the manner in which the felony was committed.

In the present case, the predicate felony for the second-degree felony-murder theory was assault with a deadly weapon. At the time that Rose shot Watkins, NRS 200.471 defined assault as "[u]lawfully attempting to use physical force against another person" or "[i]ntentionally placing another person in reasonable apprehension of immediate bodily harm." The offense was a felony if the assault was made with the use of a deadly weapon. The assault here is based on Rose's act of aiming the gun at or near Watkins and telling her to get off the phone. The conduct could be viewed as using a deadly weapon to intentionally place the victim in reasonable apprehension of immediate bodily harm by threatening her with immediate violent injury. A jury therefore could find that the felony was assaultive and merged with the homicide. Alternatively, a properly instructed jury could have found implied malice based on the circumstances of the killing, *see* NRS 200.020(2), and still convicted Rose of second-degree murder. But based on the facts of this case and the conflicting evidence as to Rose's state of mind, we cannot conclude beyond a reasonable doubt that a rational jury would have found Rose guilty of second-degree murder absent the omitted instruction.[2] *Allred,* 120 Nev. at 415, 92 P.3d at 1250.

---

[2]Rose also argues that the jury was erroneously instructed that if it was satisfied beyond a reasonable doubt that the shooting of Watkins was accidental, then it must return a verdict of not guilty, shifting the burden of proof from the State to Rose. Because we overturn Rose's conviction on other grounds, we do not address this issue at length. However, we note that under the particular circumstances of this case, the accidental homicide instruction misstated the law and violated Rose's due process rights by relieving the government of its duty to prove beyond a reasonable doubt that Rose intentionally killed Watkins. *Francis v. Franklin,* 471 U.S. 307, 326 (1985) (noting that jury instructions which relieve the government of its burden of proof violate a defendant's due process rights). Further, we take this opportunity to emphasize that the district courts should always be vigilant to give appropriate instructions on presented issues, and failure to do so may prompt appellate review, even in the absence of objection below, when necessary to protect a defendant's right to a fair trial. *See Flanagan v. State,* 112 Nev. 1409, 1423, 930 P.2d 691, 700 (1996).

We also have considered Rose's claim that there was insufficient evidence to support his conviction and conclude that it lacks merit. *See Origel-Candido v. State,* 114 Nev. 378, 381, 956 P.2d 1378, 1380 (1998) ("The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (internal quotations omitted)); *see also* NRS 200.020(2) ("Malice shall be implied when no considerable provocation appears, or when all the circumstances' of the killing show an abandoned and malignant heart."); *Keys v. State,* 104 Nev. 736, 738, 766 P.2d 270, 271 (1988) (explaining that malice may be implied from " 'the intentional use of a deadly weapon in a deadly and dangerous manner' " (quoting *Moser v. State,* 91 Nev. 809, 812, 544 P.2d 424, 426 (1975))). Given our decision to reverse the judgment of conviction, we need not address Rose's other claims on appeal.

Accordingly, we reverse the judgment of conviction and remand to the district court for further proceedings consistent with this opinion.

PICKERING and HARDESTY, JJ., concur.