138 Nev., Advance Opinion 39

IN THE SUPREME COURT OF THE STATE OF NEVADA

RONNEKA ANN GUIDRY,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 80156

**FILED**

JUN 02 2022

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY _____
CHIEF DEPUTY CLERK

Appeal from a judgment of conviction, pursuant to a jury verdict, of second-degree murder, robbery, grand larceny, and leaving the scene of an accident that resulted in bodily injury. Eighth Judicial District Court, Clark County; Cristina D. Silva, Judge.

*Affirmed in part, reversed in part, vacated in part, and remanded.*

Darin F. Imlay, Public Defender, and Sharon G. Dickinson, Chief Deputy Public Defender, Clark County,
for Appellant.

Aaron D. Ford, Attorney General, Carson City; Steven B. Wolfson, District Attorney, Jonathan E. VanBoskerck, Chief Deputy District Attorney, and Michael J. Scarborough, Deputy District Attorney, Clark County,
for Respondent.

BEFORE THE SUPREME COURT, SILVER, CADISH, and PICKERING, JJ.

*OPINION*

By the Court, PICKERING, J.:

Appellant Ronneka Guidry challenges her convictions for second-degree murder, robbery, grand larceny, and leaving the scene of an

22-17530

accident that resulted in bodily injury. She argues that the district court's instruction on murder was inaccurate and caused prejudice because the court instructed on an irrelevant legal principle—second-degree felony murder—in an incomplete way. We agree, especially because the instruction had the effect of relieving the jury of its burden to find beyond a reasonable doubt that Guidry acted with implied malice aforethought. Guidry's challenges to her remaining convictions fail. We therefore reverse Guidry's murder conviction, affirm her remaining convictions, vacate the sentences on those convictions, and remand.

## I.

While Eduardo Osorio was on vacation in Las Vegas, he met Ronneka Guidry, a stranger to him, inside Caesars Palace at two in the morning. Osorio was wearing an $8,000 Rolex watch that his father had given him for his 18th birthday. According to Guidry, Osorio asked her for a ride, and she agreed. The two walked to Guidry's car, occasionally touching each other, then drove to an open-air self-parking lot attached to the Westin Las Vegas Hotel & Spa. Seven minutes later, Osorio left the car, and Guidry drove into the parking garage structure in the Westin, exiting the property and returning to the public street.

Eyewitness Timothy Landale was at the nearby intersection of East Flamingo Road and Koval Lane when he saw someone, later identified as Osorio, run past him into the street and jump in front of a moving car. The car stopped, and Osorio got on the hood of the car, screaming, and began punching the windshield. Osorio's screaming, which may have been in a language other than English, was incomprehensible to Landale. Landale said that Osorio "just kept punching the windshield"—"[h]e was trying to break the windshield it looked like"—and "when it looked like [Osorio] was

SUPREME COURT
OF
NEVADA

(O) 1947A

going to the [driver's] side to try to punch the other window," the driver accelerated and drove forward. Osorio hung on to the car for a few seconds, then either let go or fell, hitting his head. He died of multiple blunt force injuries, and the forensic pathologist determined his manner of death to have been an accident.

Osorio's Rolex, however, was missing. Using security footage from Caesars and the Westin, Las Vegas Metropolitan Police identified Guidry's car as the vehicle involved in Osorio's death, arrested her on an outstanding, unrelated traffic warrant, and brought her in for questioning. Under questioning, Guidry stated that Osorio "attacked" her car and "[j]ust imagine if I wasn't in the car." She said that the way Osorio was banging on her window scared her, made plain that she believed she would be harmed, and said, "I'm a female, I can't beat this man up." She also repeatedly denied ever taking property belonging to Osorio, including his watch. The footage shows that under two minutes had passed between the time Osorio left Guidry's car and the time Landale saw him jump on the hood of her car.

The police executed search warrants at Guidry's house and on her iPhone. On Guidry's iPhone, police found a photo of her badly fractured windshield, as well as photos of Osorio's Rolex. Detective Kenneth Salisbury testified that, looking at the type of fracturing of Guidry's windshield and the lacerations on Osorio's hand, he believed that Osorio's punching had caused the fracturing, although he could not rule out the possibility that Osorio had fallen into the windshield as the car accelerated. There were also text messages showing that Guidry had negotiated the sale of the Rolex for $4,500 and had shipped the watch to a buyer in Florida.

 

The State charged Guidry with first-degree murder with use of a deadly weapon, robbery with use of a deadly weapon, grand larceny, and leaving the scene of an accident that resulted in bodily injury (leaving the scene). At trial, the State presented evidence that Guidry's car was traveling at around 23 miles per hour when Osorio fell from its hood, then reached a speed of around 59 miles per hour by the time it left the surveillance footage. The jury convicted Guidry of second-degree murder, robbery, grand larceny, and leaving the scene, acquitting her of first-degree murder on a felony-murder theory. Guidry appealed.

## II.

It is appropriate to reverse Guidry's conviction for second-degree murder because the district court's murder instruction was plainly inaccurate and caused prejudice. Specifically, Guidry argues that the murder instruction set out a theory of murder that was both irrelevant to her case and inaccurate. We review whether a particular instruction gives the jury a correct statement of law de novo. *Cortinas v. State*, 124 Nev. 1013, 1019, 195 P.3d 315, 319 (2008). Because Guidry did not object to the phrasing of the instructions in question, plain-error review applies. To secure reversal based on plain error Guidry must show that (1) "there was 'error,'" (2) it "was 'plain' or clear," and (3) it "affected [her] substantial rights." *Green v. State*, 119 Nev. 542, 545, 80 P.3d 93, 95 (2003). The "'plainness' of the error can depend on well-settled legal *principles* as much as well-settled legal *precedents*." *United States v. Brown*, 352 F.3d 654, 664 (2d Cir. 2003). When assessing whether an error affected the defendant's substantial rights, we look to whether it had a "prejudicial impact on the verdict," contributed to a miscarriage of justice, or otherwise "seriously affects the integrity or public reputation of the judicial proceedings."

*Gaxiola v. State*, 121 Nev. 638, 654, 119 P.3d 1225, 1236 (2005) (quoting *Rowland v. State*, 118 Nev. 31, 38, 39 P.3d 114, 118 (2002)); *Green*, 119 Nev. at 545, 80 P.3d at 95.

Murder is the "unlawful killing of a human being" with express or implied malice aforethought. NRS 200.010(1); *see* 2 Wayne R. LaFave, *Substantive Criminal Law* § 14.1(a) (3d ed. 2017) (summarizing the modern categories of murder). To find a defendant guilty of killing with express malice, the jury must find that the defendant intended to kill. NRS 200.020. Or, for implied malice under a "depraved heart" theory of second-degree murder, the defendant must have acted with extreme recklessness regarding the risk to and conscious disregard for human life. *Collman v. State*, 116 Nev. 687, 715-18 & n.13, 7 P.3d 426, 444-45 & n.13 (2000) (citing *People v. Mattison*, 481 P.2d 193, 196-97 (Cal. 1971)); *see also id.* at 712-13, 7 P.3d at 442; Model Penal Code § 210.2(1)(b) (providing that criminal homicide is murder when committed "recklessly under circumstances manifesting extreme indifference to the value of human life"); *see also Labastida v. State*, 115 Nev. 298, 307-08, 986 P.2d 443, 449 (1999) (suggesting that a defendant's lack of subjective awareness that her child was in serious or mortal danger showed that she did not act with malice). Absent either of these permutations of malice, a jury could convict of second-degree *felony* murder, but only if it finds that the defendant committed an inherently dangerous predicate felony and that there was an immediate and direct causal relationship between the defendant's acts and the victim's death. *Ramirez v. State*, 126 Nev. 203, 207, 235 P.3d 619, 622 (2010) (explaining the elements "critical to any second-degree felony-murder instruction").

SUPREME COURT
OF
NEVADA

(O) 1947A

In this case, the instructions on murder described the concept of malice but also allowed the jury to convict without finding that Guidry acted with malice. Specifically, instruction 11 provides the following:

> All murder which is not Murder of the First Degree is Murder of the Second Degree. Murder of the second degree includes:
>
> 1. A killing with malice aforethought, but not committed in the perpetration or attempted perpetration of a robbery.
>
> 2. An unintentional killing occurring in the commission of an unlawful act, which, in its consequences, naturally tends to destroy the life of a human being, or is committed in the prosecution of a felonious intent. However, if the felony is Robbery, the crime is First Degree Murder.

The instruction begins by stating that murder "includes" two individually numbered subsections, indicating to the jury that it may choose between the options, the second being an "unintentional killing occurring in the commission of an unlawful act, which, in its consequences, naturally tends to destroy the life of a human being, or is committed in the prosecution of a felonious intent." This language regarding an "unintentional killing" derives from NRS 200.070(1), the involuntary manslaughter statute, but it is not a complete statement of the elements of any type of murder explained above.

The State first argues that subsection two does not matter because it relates only to second-degree felony murder, which the State concedes it did not, and could not, have pursued given the facts. But this is unavailing—along with the duty to correctly instruct the jury on relevant general principles of law, the trial court "has the correlative duty to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury

Supreme Court
of
Nevada

(O) 1947A

or relieving it from making findings on relevant issues." *Gonzalez v. State*, 131 Nev. 991, 997-98, 366 P.3d 680, 684 (2015) (quoting *People v. Alexander*, 235 P.3d 873, 935 (Cal. 2010)). Here, instruction 11 had both unwanted effects. The court instructed on an irrelevant legal principle—second-degree felony murder—in an incomplete way, which relieved the jury from making findings relevant to the theory of murder actually at issue. And even if second-degree felony murder were in play, instruction 11(2) did not inform the jury of the critical "restrictions" that we have placed on the doctrine. *Rose v. State*, 127 Nev. 494, 500, 255 P.3d 291, 295 (2011). Namely, the instruction did not require the jury to find an appropriate predicate felony; it did not explain that the predicate felony must be inherently dangerous; and it did not instruct the jury that it must find an immediate and direct causal relationship between Guidry's acts and Osorio's death. *See id.* at 501, 255 P.3d at 296 (citing *Ramirez*, 126 Nev. at 207, 235 P.3d at 622).[1] Last, the language regarding an unintentional killing did not require the jury to find that Guidry acted with malice aforethought, as required under the depraved heart theory of murder. *See United States v. Perez*, 43 F.3d 1131, 1139 (7th Cir. 1994) (explaining that the "difference between omitting a discussion of an element of the offense" and failing to instruct a jury clearly on an element "ought not be outcome determinative" and that "the effect rather than the character of an instructional error is what is important").

The State argues that, given the other instructions on malice, there was no error. For example, instruction 5 states that murder is the

---

[1]The State has not argued that Guidry committed any felony that would serve as an appropriate predicate for second-degree felony murder, nor does the charging document clarify the matter.

"unlawful killing of a human being with malice aforethought, either express or implied." But even "[t]aken as a whole, the jury instructions do not cure the ambiguity," *Tanksley v. State*, 113 Nev. 844, 849, 944 P.2d 240, 243 (1997), because the jury could have understood instruction 5 to be the general rule and instruction 11 the exception or the specific application of that rule. This is especially so given that the jury was instructed on inferring malice in the context of first-degree felony murder. *See Crawford v. State*, 121 Nev. 744, 754, 121 P.3d 582, 588 (2005) (observing that jurors should not be "expected to be legal experts" or to make "legal inferences").

Accordingly, there was error and the error was plain, but Guidry did not object. So, she must show that the error affected her "substantial rights." NRS 178.602. The evidence that Guidry acted with malice was not overwhelming, especially as to whether she acted with "extreme recklessness regarding the risk to human life," as opposed to the risk of injury. *Collman*, 116 Nev. at 717, 7 P.3d at 445; *see People v. Knoller*, 158 P.3d 731, 741 (Cal. 2007) (holding that implied malice is not established by proving that a defendant acted with "conscious disregard of the risk of serious bodily injury"). And with these instructions, it is impossible for us to conclude whether the jury in fact found that Guidry acted with malice.

Applying instruction 11, subsection 2, the jury could have, for example, concluded that Guidry was guilty of second-degree murder because she committed an unlawful act that was dangerous in the abstract and Osorio died in the process—without finding that Guidry's specific conduct was sufficiently dangerous and Guidry was conscious of its risk to life. *Cf. Collman*, 116 Nev. at 717-18 & n.13, 7 P.3d at 444-45 & n.13. Alternatively, the jury could have concluded that Guidry was guilty of second-degree murder because she committed an unlawful act (any

unlawful act, even failing to exercise due care to avoid a collision with a pedestrian, *see* NRS 484B.280(1)(a)) with a felonious intent (meaning, to a jury, possibly just a wrongful intent), and Osorio died in the process—again, without making the requisite finding of malice. The fact that this instruction relieved the jury from its obligation to find a necessary element of the crime signals a serious problem, especially when the jury might have entertained a doubt as to that element. *See Perez*, 43 F.3d at 1139 (explaining that while failure to instruct clearly on the elements of an offense is not always plain error, "the gravity of such an error makes reversal the usual outcome in such circumstances").

The concern is not theoretical or academic. During deliberations, the jury asked, "If we find defendant guilty of robbery, can involuntary manslaughter be the accompanying verdict? Or, does by definition, it turn into first degree murder?" This indicates that some on the jury may have considered convicting Guidry of involuntary manslaughter, not murder, for lack of evidence of her malice. In response, the court referred the jury to six instructions for guidance, including instruction 11. Even though a jury could have ultimately concluded that Guidry did act with implied malice, the error identified here fundamentally undermines our confidence in the murder conviction. We therefore hold that the error in instruction affected Guidry's substantial rights by causing actual prejudice, and we reverse her conviction for second-degree murder. *See Green*, 119 Nev. at 545, 80 P.3d at 95.

III.

Guidry makes numerous arguments challenging her convictions for robbery, grand larceny, and leaving the scene. However, the evidence at trial supporting these convictions was strong, and many of the

Supreme Court
of
Nevada

(O) 1947A

9

errors she asserts are not preserved and therefore subject to the demanding plain-error standard.

A.

Guidry's sufficiency-of-the-evidence challenges fail. Given the deferential standard that applies, the evidence was sufficient to support the convictions for grand larceny, robbery, and leaving the scene. *See McNair v. State*, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992). Although Guidry's defense at trial was that Osorio gave her the watch, considering the watch's economic and sentimental value to Osorio, Osorio's behavior after leaving Guidry's car, and Guidry's false statement to police that she never touched the watch, a rational trier of fact could have found otherwise beyond a reasonable doubt. *See Grant v. State*, 117 Nev. 427, 435, 24 P.3d 761, 766 (2001) ("Intent [to permanently deprive] . . . can be inferred from conduct and circumstantial evidence.").

As for robbery, when a person takes personal property from another and uses force or fear to retain possession of that property, such use of force may elevate the taking to a robbery. *See* NRS 200.380(1). Specifically, a "taking constitutes a robbery where the use of force follows the taking, *and* where the forcible conduct is part of a continuous transaction." *Abeyta v. State*, 113 Nev. 1070, 1078, 944 P.2d 849, 854 (1997) (emphasis added); *see* 77 C.J.S. *Robbery* § 16 & n.13 (2021 update) (discussing the "continuous sequence of events" theory of robbery); 2 Jens David Ohlin, *Wharton's Criminal Law* § 31:10 (16th ed. 2021) (explaining that the statutory extension of common-law robbery to include use of force during asportation "is not necessarily inconsistent with the common-law theory of robbery" because "the thief has not 'taken' possession of the property until the defendant's use of force or threatened force has effectively

SUPREME COURT
OF
NEVADA

(O) 1947A

cut off any immediate resistance to the defendant's 'possession'"). Under the unique facts here, a rational jury could have found beyond a reasonable doubt that when Guidry accelerated with Osorio on her car, that was part of a continuous transaction that began with her physically taking his watch while he was inside the car.[2] *See, e.g., Barkley v. State*, 114 Nev. 635, 636-37, 958 P.2d 1218, 1218-19 (1998); *Young v. State*, 725 N.E.2d 78, 80-81 (Ind. 2000). In addition, contrary to Guidry's assertion, a vehicle crashing into something is not an element of leaving the scene. *See Clancy v. State*, 129 Nev. 840, 849, 313 P.3d 226, 232 (2013) (concluding that "actual physical contact between two vehicles is not required for a person to be involved in an accident under NRS 484E.010").[3]

Similarly, Guidry's dual convictions for robbery and grand larceny do not violate the Double Jeopardy Clause. *See Jackson v. State*, 128 Nev. 598, 604, 291 P.3d 1274, 1278 (2012) ("The *Blockburger* test 'inquires whether each offense contains an element not contained in the other; if not, they are the "same offence" and double jeopardy bars additional punishment and successive prosecution.'") (quoting *United States v. Dixon*, 509 U.S. 688, 696 (1993)). An element of robbery, but not of grand larceny, is the use of force or coercion. *See* NRS 200.380(1); NRS 205.220. And an element of grand larceny, but not of robbery, is the specific intent to

---

[2]Guidry appears to concede this in her reply brief, disavowing that she ever said that "the robbery was completed when [Osorio] jumped on her car." And while we agree with Guidry that instruction 10 could have been worded more precisely—to reflect our holding in *Abeyta*, 113 Nev. at 1078, 944 P.2d at 854—the unobjected-to error does not warrant reversal.

[3]The evidence was also sufficient to support second-degree murder. *See McNair*, 108 Nev. at 56, 825 P.2d at 573. However, we reverse that conviction due to the instructional error identified *supra*.

permanently deprive another of property. *See* NRS 205.220; *Burnside v. State*, 131 Nev. 371, 394-95, 352 P.3d 627, 643-44 (2015) (indicating robbery is a general intent crime); *Harvey v. State*, 78 Nev. 417, 419, 375 P.2d 225, 226 (1962) (indicating larceny is a specific intent crime). The Legislature can, of course, provide greater protection than the Double Jeopardy Clause affords. *See, e.g.*, Cal. Penal Code § 654(a) (West 2022 update) (providing that "in no case shall [an] act or omission be punished under more than one provision"). But there is no such legislative protection here.

B.

Guidry's instructional error arguments also fail. As to Guidry's robbery conviction, she vaguely argues on appeal that unpreserved errors in the self-defense instructions mean her robbery conviction must be reversed for plain error, but she cites no decisional authority reversing a robbery conviction for analogous reasons. *See Maresca v. State*, 103 Nev. 669, 673, 748 P.2d 3, 6 (1987) ("It is appellant's responsibility to present relevant authority and cogent argument; issues not so presented need not be addressed by this court."). Moreover, the question whether a robbery can be committed in self-defense appears nuanced. *See People v. DeGreat*, 428 P.3d 541, 545 (Colo. 2018) ("[O]ther courts have opined that under certain circumstances, robbery may indeed be committed in self-defense."); *Commonwealth v. Rogers*, 945 N.E.2d 295, 306-07 (Mass. 2011) (declining to resolve the question whether an armed robber forfeits the right of self-defense in case where the defendant used a weapon only during the attempted escape).

Even setting that foundational uncertainty aside, Guidry's arguments are not sufficiently supported. She first argues that NRS 200.120(1) applies, which states that a killing is justified in specific self-

Supreme Court
OF
Nevada

(O) 1947A

defense circumstances that may fall short of the classic self-defense scenarios codified in NRS 200.200. But NRS 200.120(1) also indicates that, before a person may use deadly force under that statute, the person must retreat, unless the person is not the original aggressor, has a right to be present at the location where deadly force is used, and is not "actively engaged in conduct in furtherance of criminal activity at the time deadly force is used." This latter limitation is notable here. By convicting Guidry of robbery, the jurors indicated that they would not have acquitted her based on NRS 200.120(1). A necessary component of the jury's robbery conviction in this case was its holding that Guidry used force during the course of a continuing larceny, i.e., while actively engaged in conduct in furtherance of criminal activity.

A distinct self-defense statute, NRS 200.200, does not have such a criminal conduct limitation, and it provides that a killing is justified if the danger was so urgent and pressing that the killing of the other was absolutely necessary to prevent the person from receiving great bodily harm. But if the person asserting self-defense was "the assailant," the law requires that he or she have "really, and in good faith, endeavored to decline any further struggle before the mortal blow was given." NRS 200.200(2). Guidry does not argue that she in good faith endeavored to decline any further struggle. Thus, these facts present the question whether Guidry was "the assailant," and if so whether, even if she failed to withdraw, she regained a right to act in self-defense if Osorio reasonably appeared to threaten her with imminent great bodily harm or death. *See* Justin F. Marceau, *Killing for Your Dog*, 83 Geo. Wash. L. Rev. 943, 998 (2015) ("[T]he dominant rule seems to be that a *nondeadly* aggressor is treated the same as *nonaggressor*; when either is confronted with deadly force, he or she

SUPREME COURT
OF
NEVADA

(O) 1947A

probably has a right to use deadly force without retreating, at least in no-retreat, majority jurisdictions.").

We observe that states are not uniform in how they define assailants, more commonly referred to as initial aggressors, and the related concept of provocateurs. John D. Moore, Note, *Reasonable Provocation Distinguishing the Vigilant From the Vigilante in Self-Defense Law*, 78 Brook. L. Rev. 1659, 1663 (2013); *see Andrews v. United States*, 125 A.3d 316, 322 (D.C. 2015) (reflecting an imbalanced split of authority regarding what makes one a provocateur); Kimberly Kessler Ferzan, *Provocateurs*, 7 Crim. L. & Phil. 597 (2013) (arguing "provocateurs need to be distinguished from their cousins, initial aggressors"). Further, our own law does not clearly mandate a particular outcome here: *Johnson v. State*, 92 Nev. 405, 407-08, 551 P.2d 241, 242 (1976), provides that an aggressor is a person who acts with the fraudulent intent to force a deadly issue in order to create the necessity for his own assault; however, *State v. Grimmett*, 33 Nev. 531, 112 P. 273, 273 (1910), states more broadly that an aggressor is one who voluntarily seeks, provokes, invites, or willingly engages in a difficulty of his own free will. Ultimately, "[f]or an error to be plain, it must, 'at a minimum,' be 'clear under current law.'" *Gaxiola*, 121 Nev. at 648, 119 P.3d at 1232 (quoting *United States v. Weintraub*, 273 F.3d 139, 152 (2d Cir. 2001)).[4]

---

[4]If the State retries Guidry on the murder charge, the district court may consider these issues with fresh eyes—here we only consider the self-defense issues in the context of plain-error review and in the context of the robbery charge.

SUPREME COURT
OF
NEVADA

(O) 1947A

Guidry next argues that the district court erred by refusing to instruct the jury that, if the jury found she acted because of legal necessity or self-defense, it could not convict her of leaving the scene. Yet the evidence did not suggest that Guidry was under any real or reasonably perceived threat when she drove off; Osorio had already fallen from her car and sustained mortal injuries. *See Williams v. State*, 99 Nev. 530, 531, 665 P.2d 260, 261 (1983) (holding that a defendant is entitled to a requested theory-of-the-case jury instruction "so long as there is some evidence, no matter how weak or incredible, to support it"). Similarly, even if Guidry is correct in her assertion that there were errors in instruction 26, defining grand larceny; instruction 29, defining leaving the scene; and instruction 35, defining highway, these errors were not preserved and Guidry has not shown that they affected her substantial rights, NRS 178.602, as required for us to reverse on plain-error review.

### C.

Guidry raises various other trial errors, but many were not preserved or were inadequately developed on appeal, and none warrants reversal, individually or cumulatively.[5] She first argues that the court unreasonably restricted voir dire by preventing her from repeating her statement that she worked as a prostitute, but she failed to object at trial. And because the record shows that Guidry was free to explore juror bias respecting prostitution—as long as she did not tell the venire panel members what the evidence at trial would show—and because both she and the prosecutor did just that, she has not shown that she was prejudiced or

---

[5]We specifically address Guidry's major claims but find that none of the trial-error arguments she asserts challenging the robbery, grand larceny, and leaving the scene convictions presents a basis for relief.

SUPREME COURT
OF
NEVADA

(O) 1947A

that any error in jury selection affects the integrity or public reputation of the judicial proceedings. *Cf. State v. Ousley*, 419 S.W.3d 65, 73, 75 (Mo. 2013) (holding that a trial court erred by prohibiting a defendant from asking the venire panel members whether they could consider the possibility of a fact that the defendant intended to explore at trial, where the question was not otherwise improper).

She next argues that the prosecutor committed misconduct in characterizing the evidence, and we agree. A prosecutor "has a duty to refrain from making statements in opening arguments that cannot be proved at trial." *Rice v. State*, 113 Nev. 1300, 1312, 949 P.2d 262, 270 (1997), *modified on other grounds by Richmond v. State*, 118 Nev. 924, 932, 59 P.3d 1249, 1254 (2002). But "[e]ven if the prosecutor overstates in his opening statement what he is later able to prove at trial, misconduct does not lie unless the prosecutor makes these statements in bad faith." *Id.* at 1312-13, 949 P.2d at 270. Here, toward the end of his opening statement, the prosecutor said the following:

> When you put that altogether the evidence is going to show exactly what happened. That Mr. Osorio had contact with Ms. Guidry. He thought he was going to have some sort of sexual contact with her. She lured him into [her] vehicle. She drove him to the Westin. And during the course of that interaction, she slipped off his watch and then got him out of the vehicle. And when he realized his watch was missing, he ran to the vehicle and tried to stop her. *And when he jumped out in front of her and put his hands on her hood and said, Stop, I want my watch back.*
>
> You're going to hear from the detective in this case—

SUPREME COURT
OF
NEVADA

(O) 1947A

(emphasis added). Defense counsel objected, and the prosecutor responded, "This is all—what the evidence is going to show." But despite the prosecutor's assurance to the court that the evidence would support his statement about what the victim said before he died, it did not. Instead, eyewitness Landale testified that Osorio was screaming, maybe in another language, and that he did not understand what Osorio said. Nothing in the record supports that the prosecutor could have had a good-faith belief that the evidence would show that Osorio said, "Stop, I want my watch back," before he died. At the grand jury hearing, for example, one witness testified that her car windows were closed so she could not hear anything, and Landale testified that he did not know if Osorio was even yelling words. Nor did the prosecutor submit any document to the court that would support his good-faith belief that he would be able to prove what he said. In this context, we reject the State's argument that the remark was a mere turn of phrase.

The prosecutor misstated the evidence in rebuttal closing argument as well. *See Truesdell v. State*, 129 Nev. 194, 203, 304 P.3d 396, 402 (2013). With regard to Osorio's initial exit from the car, the prosecutor argued that "17 seconds elapsed between the time [Guidry] pulls away and her car door shuts. And if you even look, she uses the momentum of the car to close that car door. She pulls out and turns right. That's what causes the door to close. She doesn't even wait for [Osorio] to be fully out of the vehicle." The State posits that this was a turn of phrase too—an argument that verges on a concession, and which we reject, as the chain of events that the prosecutor described does not appear on the grainy video and is not a fair inference from the evidence. *See Colton v. Murphy*, 71 Nev. 71, 72, 279 P.2d 1036, 1036 (1955) (noting that argument left without response was

SUPREME COURT
OF
NEVADA

(O) 1947A

conceded). Nonetheless, in light of the strong evidence supporting the robbery, grand larceny, and leaving the scene convictions, prosecutorial misconduct does not undermine the soundness of those convictions. *See Valdez v. State*, 124 Nev. 1172, 1192, 196 P.3d 465, 478-79 (2008) ("[W]e apply the harmless-error analysis for prosecutorial misconduct of a nonconstitutional dimension. In doing so, we conclude that the prosecutor's comment alone did not substantially affect the verdict because [it] was made early on in the proceedings, and there was substantial evidence that Valdez attempted to kill S.E.").

Guidry goes on to challenge the admission of different pieces of evidence. The factual record is undeveloped and therefore insufficient to support her claims that the police unreasonably seized her car when they impounded it, that they used trickery to ensure that she left her phone in the car at that time, that the lengths of her detention and her questioning were unreasonable, or that her statement was involuntary.[6] And the district court did not abuse its discretion by admitting a somewhat graphic photograph of Osorio's injuries because it provided context to the events and was unlikely to inflame the jury. *See Harris v. State*, 134 Nev. 877, 880, 432 P.3d 207, 211 (2018) (explaining that the "district court [acts] as a gatekeeper by assessing the need for the evidence on a case-by-case basis and excluding it when the benefit it adds is substantially outweighed by the unfair harm it might cause"). Further, any error in admitting exhibit 89, a

---

[6]Moreover, Guidry has not supported her claims that the police coerced her daughter into giving them Guidry's cell-phone passcode or that a search warrant that is alleged to be overbroad in part requires all evidence obtained pursuant to that warrant to be suppressed with cogent argument and relevant authority. We therefore do not consider them. *See Maresca*, 103 Nev. at 673, 748 P.2d at 6.

SUPREME COURT
OF
NEVADA

(O) 1947A

photograph taken during a search of Guidry's home of a purse and the cash found inside, did not cause prejudice because it is unlikely that a reasonable jury would find that simply because Guidry had cash, that meant she stole Osorio's watch, especially given the other strong evidence.

As these issues at trial were unfolding, Guidry's counsel stated that he had not received Detective Salisbury's (a testifying expert witness) full report. While this is clearly concerning, *see* NRS 174.234(2)(c), Guidry's counsel then readily accepted the district court's suggestion that, after reviewing the full report, counsel could call Salisbury for additional questioning. "We will not find an abuse of discretion . . . unless there is a showing that the State has acted in bad faith, or that the non-disclosure results in substantial prejudice to appellant, and that such prejudice has not been alleviated by the trial court's order." *Langford v. State*, 95 Nev. 631, 635, 600 P.2d 231, 234-35 (1979). This record discloses neither. In brief, we affirm.

IV.

Because the district court may have sentenced Guidry differently if Guidry had been convicted of only robbery, grand larceny, and leaving the scene, we remand this matter for resentencing. *Powell v. State*, 113 Nev. 258, 264, 934 P.2d 224, 228 (1997). The court properly considered the "nature and seriousness" of the offenses in determining the sentence, and we cannot say whether the court would have imposed a lower sentence had Guidry been convicted of less serious offenses. We are also concerned by the court's repeated references to jail calls that primarily showed that Guidry was upset that her daughter had given the police the passcode to her cell phone. While the calls may not have been wholly irrelevant, they had limited probative value, especially given that Guidry maintained her

Supreme Court
OF
Nevada

(O) 1947A

innocence. *See Brake v. State*, 113 Nev. 579, 585, 939 P.2d 1029, 1033 (1997) ("[T]he district court's consideration of Bryan's 'lack of remorse' after he had maintained his innocence violated Bryan's Fifth Amendment rights and constituted an abuse of discretion.").

V.

In sum, the district court's murder instruction was inaccurate in that it provided an alternate theory of murder liability that was both incomplete and irrelevant, and which had the effect of relieving the jury of its burden to find beyond a reasonable doubt that Guidry had acted with malice aforethought. This error affected Guidry's substantial rights, and we therefore reverse the murder conviction and remand. Otherwise, we affirm the convictions for robbery, grand larceny, and leaving the scene of an accident, but we vacate the sentences and remand for resentencing.

_____Pickering_____, J.
Pickering

We concur:

_____Silver_____, J.
Silver

_____Cadish_____, J.
Cadish

SUPREME COURT
OF
NEVADA

(O) 1947A